FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 2 8 2014 ★

BROOKLYN OFFICE

JDG:DAS/PT/AAS
F. #2012R01872

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against -

JOHN SAMPSON,

                  Defendant.

– – – – – – – – – – – – X

S U P E R S E D I N G
I N D I C T M E N T

Cr. 13-269 (S-2)(DLI)
(T. 18, U.S.C., §§ 666(a)(1)(A),
  981(a)(1)(C), 1001(a)(2), 1503(a),
  1503(b)(3), 1512(b)(2)(A),
  1512(b)(2)(B), 1512(b)(2)(C),
  1512(b)(3), 1512(c)(1), 1519, 2 and
  3551 et seq.; T. 21, U.S.C., § 853(p); T. 28,
  U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

INTRODUCTION

      At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.    The Defendant

        1.    From 1997 through the present, the defendant JOHN SAMPSON was a

member of the New York State Senate (the "Senate") representing the 19th Senate District in

southeastern Brooklyn.   From June 2009 to December 2012, SAMPSON was the leader of the

Democratic Conference of the Senate.   From January 2011 to December 2012, SAMPSON was

also the Minority Leader of the Senate.   As a member of the Senate, SAMPSON was required

by New York Public Officers Law § 73-a to annually disclose, among other things, any

ownership interest he had in any business and any outstanding debts he owed.

2. Since 1992, the defendant JOHN SAMPSON was an attorney licensed to practice law in the State of New York.   His law practice included, among other things, criminal defense work and legal work involving the sale of foreclosed properties.

3. In September 2005, the defendant JOHN SAMPSON participated as a candidate in the Democratic Party primary election for the position of Kings County District Attorney.   SAMPSON lost this primary election.

II.   Overview of JOHN SAMPSON's Criminal Schemes

4. Since the 1990's, the defendant JOHN SAMPSON served as a court-appointed referee for foreclosure proceedings conducted by the Supreme Court of the State of New York (the "Supreme Court").   In that capacity, SAMPSON, acting on behalf of the Supreme Court, controlled escrow accounts holding proceeds of foreclosure sales of Brooklyn real estate properties.

5. Since approximately 1998, the defendant JOHN SAMPSON embezzled approximately $440,000 in funds from escrow accounts relating to foreclosure proceedings involving four Brooklyn real estate properties.

6. On or about July 21, 2006, the defendant JOHN SAMPSON asked an associate (the "Associate"), an individual involved in the real estate business whose identity is known to the Grand Jury, for $188,500.   The Associate agreed and, at SAMPSON's direction, provided SAMPSON with these funds (the "Associate Transaction") in the form of three bank checks payable to third parties.   SAMPSON asked for this $188,500 because he feared that his embezzlement of funds from foreclosure sales, which he told the Associate he had used to pay expenses arising from his campaign for Kings County District Attorney in 2005, could subject

2

him to criminal prosecution.   SAMPSON therefore sought the funds from the Associate Transaction to repay the embezzled funds before the embezzlement was uncovered.

7.    The defendant JOHN SAMPSON characterized the Associate Transaction as a loan that he would repay.   However, SAMPSON accepted this "loan" without written documentation of the transaction or a contemplated rate of interest.   SAMPSON never repaid these funds to the Associate.   Further, SAMPSON did not divulge the Associate Transaction in his Senate financial disclosure forms, as required.

8.    In July 2011, law enforcement authorities arrested the Associate on bank and wire fraud charges as part of a scheme to defraud mortgage lenders (the "Mortgage Fraud Case").   These charges were filed by the United States Attorney's Office for the Eastern District of New York (the "USAO").

9.    Shortly after the Associate was arrested, the defendant JOHN SAMPSON began engaging in a scheme to obstruct justice, so as to prevent the Associate from cooperating with law enforcement authorities, and thereby prevent authorities from learning of SAMPSON's criminal conduct.   SAMPSON engaged in multiple instances of obstructive conduct, including: (1) attempting to obtain confidential, nonpublic information regarding the Mortgage Fraud Case through a person who, at the time, was an administrative employee in the USAO; and (2) directing the Associate to withhold documentation of the Associate Transaction from the government.

10.    A few months after the Associate's arrest, in or about December 2011, the defendant JOHN SAMPSON acquired an ownership interest in a liquor store located in Brooklyn (the "Liquor Store").   Four other partners, individuals whose identities are known to the Grand

3

Jury ("Partner #1," "Partner #2," "Partner #3," "Partner #4," or "the Partners," collectively), also had ownership interests in the Liquor Store.   SAMPSON concealed his ownership interest in the Liquor Store.   To this end and in violation of New York State law, SAMPSON and the Partners falsely represented to the New York State Liquor Authority (the "SLA") that Partner #1 and Partner #2 were the sole owners of the Liquor Store.   SAMPSON also hid his ownership interest in the Liquor Store from his Senate staff members, including a staff member SAMPSON directed to intervene with a New York State agency on behalf of the Liquor Store.

11.     On July 27, 2012, Special Agents of the Federal Bureau of Investigation (the "FBI") approached the defendant JOHN SAMPSON outside his Brooklyn residence and asked him about his involvement in, among other things, the criminal schemes outlined above. SAMPSON made materially false statements to the FBI agents regarding these criminal schemes.

III.   Foreclosure Proceedings

12.     Under the New York State Constitution, the Supreme Court was a single tribunal of general statewide jurisdiction.   The responsibilities of the Supreme Court included, among other matters, adjudicating foreclosure actions against real property.   Justices of the Supreme Court appointed local attorneys to act as referees for any such foreclosure proceedings. The referee was entrusted by the Supreme Court with conducting the sale of a foreclosed property, and using the proceeds to repay any outstanding mortgages on the property.   The referee was also required to tender any surplus funds to the local county clerk.   Once such surplus funds were deposited with the county clerk, the prior owners of the property, and any other interested parties, had the right to receive these funds.   The referee owed a fiduciary duty

4

to the Supreme Court and was prohibited by law from enriching himself at the expense of the Supreme Court.

13.     In or about and between 2007 and 2009, the Supreme Court received in excess of $10,000 in federal grants each year.

IV.     The Embezzlement Scheme

14.     Beginning in the 1990s, the defendant JOHN SAMPSON served as a court-appointed referee for foreclosure proceedings conducted by the Supreme Court.    In that capacity, SAMPSON held surplus proceeds of foreclosure sales in escrow accounts (or "surplus funds"), from which he would receive and disburse the funds on behalf of the Supreme Court (the "Referee Accounts").

15.     The defendant JOHN SAMPSON breached his fiduciary obligations as referee by embezzling approximately $440,000 in surplus funds from the Referee Accounts he oversaw, involving at least four Brooklyn properties (the "Brooklyn Properties").    The Brooklyn Properties were located at 165 Forbell Street (the "Forbell Street Property"), 1915 Eighth Avenue (the "Eighth Avenue Property"), 831 Linden Boulevard (the "Linden Boulevard Property") and 224 Bay Ridge Avenue (the "Bay Ridge Avenue Property").

16.     In particular, the defendant JOHN SAMPSON breached his fiduciary obligations as referee by: (1) embezzling approximately $80,000 of surplus funds from the Referee Account for the Forbell Street Property; (2) embezzling approximately $80,000 of surplus funds from the Referee Account for the Eighth Avenue Property; (3) embezzling approximately $145,000 of surplus funds from the Referee Account for the Bay Ridge Avenue

Property; and (4) embezzling approximately $135,000 of surplus funds from the Referee Account for the Linden Boulevard Property.

17.    The defendant JOHN SAMPSON used $161,000 from the Associate Transaction to pay the Kings County Clerk and others designated by the Supreme Court a portion of the surplus funds SAMPSON had embezzled from the Referee Accounts for the Bay Ridge Avenue Property and the Linden Boulevard Property.   However, SAMPSON never repaid any of the surplus funds he had embezzled from the Referee Accounts for the Forbell Street Property and the Eighth Avenue Property.

A.    The Forbell Street Embezzlement

18.    On February 17, 1998, a Justice of the Supreme Court appointed the defendant JOHN SAMPSON referee for the foreclosure sale proceeding for the Forbell Street Property.   Pursuant to this appointment, SAMPSON was required by law to: (1) deposit the proceeds from the sale of the Forbell Street Property into a Referee Account (the "Forbell Street Referee Account"); (2) satisfy the mortgage and any other outstanding expenses related to the Forbell Street Property; and (3) promptly deposit with the Kings County Clerk any surplus funds from the foreclosure sale.

19.    On October 7, 1998, the defendant JOHN SAMPSON signed a document entitled "Referee's Report of Sale" for the Forbell Street Property.   In this report, SAMPSON represented to the Supreme Court that: (1) on or about February 17, 1998, SAMPSON sold the Forbell Street Property for $115,000; and (2) there were surplus funds of approximately $80,000 (the "Forbell Street Surplus") resulting from the sale, after repayment of the mortgage and expenses.

6

20.    The defendant JOHN SAMPSON breached his fiduciary obligations as referee and never deposited any of the Forbell Street Surplus with the Kings County Clerk. Instead, between July 1998 and June 2008, SAMPSON embezzled approximately $80,000 of the Forbell Street Surplus through cash withdrawals and electronic transfers from the Forbell Street Referee Account.   For example, on or about February 13, 2008, SAMPSON transferred $8,000 from the Forbell Street Referee Account into SAMPSON's personal bank account (the "Sampson Account").   SAMPSON never paid the Kings County Clerk any of the funds he embezzled from the Forbell Street Surplus.

B.    The Eighth Avenue Embezzlement

21.    On March 18, 2002, a Justice of the Supreme Court appointed the defendant JOHN SAMPSON referee for the foreclosure sale proceeding for the Eighth Avenue Property.   Pursuant to this appointment, SAMPSON was required by law to: (1) deposit the proceeds from the sale of the Eighth Avenue Property into a Referee Account (the "Eighth Avenue Referee Account"); (2) satisfy the mortgage and any other outstanding expenses related to the Eighth Avenue Property; and (3) promptly deposit with the Kings County Clerk any surplus funds from the foreclosure sale of the Eighth Avenue Property.

22.    On June 28, 2002, the defendant JOHN SAMPSON signed a document entitled the "Referee's Report of Sale" for the Eighth Avenue Property.   In this report, SAMPSON represented to the Supreme Court that: (1) on May 17, 2002, SAMPSON sold the Eighth Avenue Property for $180,000; and (2) there were surplus funds of approximately $80,000 (the "Eighth Avenue Surplus") resulting from the sale, after repayment of the mortgage and expenses.

7

23.     The defendant JOHN SAMPSON, however, did not deposit the Eighth Avenue Surplus with the Kings County Clerk.   Instead, starting in approximately 2002, SAMPSON began to embezzle funds from the Eighth Avenue Referee Account.

24.     As a result of the defendant JOHN SAMPSON's embezzlement, on or about July 21, 2006, a balance of $55,167.94 remained in the Eighth Avenue Referee Account. On or about July 21, 2006, SAMPSON received the Associate Transaction in the form of three bank checks totaling $188,500, one of which was in the amount of $27,500.   SAMPSON combined this $27,500 check with the $55,167.94 remaining in the Eighth Avenue Referee Account to purchase a bank check in the amount of $82,667.94 (the "2006 Bank Check").   The 2006 Bank Check was made payable to the "Kings County Clerk Office," ostensibly to repay surplus funds embezzled from the Eighth Avenue Referee Account to the Kings County Clerk.

25.     However, the defendant JOHN SAMPSON never deposited the 2006 Bank Check with the Kings County Clerk.   Instead, nearly two years later, on or about June 7, 2008, SAMPSON exchanged the 2006 Bank Check for eight bank checks worth $10,000 each and one bank check for $2,667.94 (collectively, the "2008 Bank Checks").   Each of the 2008 Bank Checks was made payable to "John Sampson," and the remitter was listed as "John Sampson."

26.     On or about and between June 12, 2008 and January 12, 2009, the defendant JOHN SAMPSON redeemed for cash two of the $10,000 bank checks, negotiated the $2,667.94 bank check and deposited three of the $10,000 bank checks into the Sampson Account.   The remaining three 2008 Bank Checks, each with a value of $10,000, were not negotiated.   SAMPSON never paid the Kings County Clerk the funds he embezzled from the Eighth Avenue Referee Account.

8

V.    JOHN SAMPSON's Obstruction of Justice

27.    Shortly after the Associate's arrest in the Mortgage Fraud Case in July 2011, the defendant JOHN SAMPSON began engaging in a multifaceted scheme to obstruct justice.

28.    From mid-December 2011 through mid-March 2012, law enforcement authorities conducted a judicially-authorized wiretap of the defendant JOHN SAMPSON's cellular telephone (the "Sampson Wiretap").

A.    JOHN SAMPSON's Use of a USAO Employee to Obstruct Justice

29.    Soon after the Associate's arrest, the defendant JOHN SAMPSON informed the Associate that SAMPSON knew an individual who, at that time, was an administrative employee in the USAO (the "Employee"), an individual whose identity is known to the Grand Jury.   SAMPSON told the Associate that the Employee could provide information that would assist the Associate's defense in the Mortgage Fraud Case.

30.    The defendant JOHN SAMPSON took numerous steps to obtain from the Employee confidential, nonpublic information regarding USAO matters.   Specifically, SAMPSON asked the Employee to determine whether the USAO was conducting a criminal investigation of SAMPSON.   In addition, SAMPSON told the Associate that he was attempting to determine the identities of cooperating witnesses in the Mortgage Fraud Case (the "Mortgage Fraud Cooperators").   During one meeting, SAMPSON told the Associate that, if SAMPSON and the Associate were able to identify the Mortgage Fraud Cooperators, SAMPSON could arrange to "take them out."

9

31.     When meeting with the defendant JOHN SAMPSON, the Associate asked about SAMPSON's additional efforts to obtain information concerning the Mortgage Fraud Case through the Employee.     SAMPSON, however, was reluctant to discuss over the telephone the Employee's illegal efforts to obtain nonpublic information concerning the Mortgage Fraud Case. For example, while meeting with the Associate on November 22, 2011, SAMPSON stated, "I can't talk on the phone . . . . From now on, our conversation is, 'I don't have no contacts, you don't know nothing.'     When we talk, that's how we talk."

32.     In April 2012, law enforcement authorities confronted the Employee concerning the Employee's contacts with the defendant JOHN SAMPSON.     Immediately thereafter, agents searched the Employee's office and located a slip of paper which contained the handwritten names of several individuals who were defendants in proceedings related to the Mortgage Fraud Case.     The Employee was then suspended and subsequently terminated from his employment at the USAO.

B.     JOHN SAMPSON's Witness Tampering and Evidence Tampering

33.     On February 22, 2012, the defendant JOHN SAMPSON met with the Associate at a restaurant in Queens, New York.     Acting at the direction of law enforcement, the Associate told SAMPSON that the federal government had subpoenaed the Associate for business records.     The Associate also told SAMPSON that, while reviewing the Associate's records, the Associate had located a check register page which memorialized SAMPSON's receipt of the funds from the Associate Transaction (the "Check Register Page").     The Associate stated that the Associate wanted to show the Check Register Page to SAMPSON before disclosing it to the government.     The Associate then handed the Check Register Page to

10

SAMPSON.   After examining the Check Register Page, SAMPSON stated, "That's a problem . . . I mean for me."

34.    The defendant JOHN SAMPSON instructed the Associate not to disclose the Check Register Page to the government.   When the Associate stated that it might be a problem to withhold the document from the government, SAMPSON told the Associate to claim that the Associate did not maintain all of the Associate's records.   SAMPSON instructed, "Don't say you don't have it.   Just say you don't know.   I don't want you to lie, just say you don't know."   SAMPSON reiterated several times that he did not want the Associate to lie, while repeatedly instructing the Associate to tell the government, "I don't have it."

35.    The defendant JOHN SAMPSON also told the Associate to remove other items from any documents the Associate provided to the government, to make it appear as though the Associate's records were incomplete.   In addition, SAMPSON suggested that the Associate could falsely claim that the funds from the Associate Transaction were payment for legal work SAMPSON performed.

36.    Later during this conversation, the defendant JOHN SAMPSON instructed the Associate that, if the government asked the Associate whether the Associate ever loaned SAMPSON money, the Associate should say "No."   SAMPSON also suggested that, alternatively, the Associate could falsely claim that the Associate "forgave" any loan to SAMPSON.

37.    The defendant JOHN SAMPSON retained the Check Register Page during and after this meeting, and never returned it to the Associate.

38.     On the evening of February 22, 2012, after the meeting described above, the defendant JOHN SAMPSON called the Associate on the telephone.   This conversation was captured on the Sampson Wiretap.   During the call, SAMPSON asked if the Associate was making "copies of everything."   The Associate responded that the Associate had brought the original Check Register Page to SAMPSON and had not kept any copies.

VI.     The Liquor Store Scheme

    A.     Background

        39.     The sale of alcoholic beverages in the State of New York, including the licensing of retail liquor stores, is regulated by the SLA.   New York State law prohibits the granting of a license to sell liquor (a "liquor license") to individuals who have been convicted of certain crimes.   Thus, the SLA requires disclosure in a liquor license application of all owners or principals of any retail liquor store.   Knowingly submitting a license application to the SLA that contains false statements or information is a felony under New York State Penal Law § 175.35 (Offering a False Instrument for Filing in the First Degree).

        40.     In the State of New York, retail liquor stores are required to collect sales taxes on items sold to the public and to remit such taxes to the New York State Department of Taxation and Finance (the "T&F").

    B.     JOHN SAMPSON's Hidden Ownership Interest in the Liquor Store

        41.     During the Fall of 2011, the defendant JOHN SAMPSON arranged for some of the Partners to invest hundreds of thousands of dollars in the Liquor Store, which one of the Partners had purchased recently.   When acquired from the previous owner, the Liquor Store was in arrears on its sales tax obligations due to the T&F.   Although SAMPSON never

12

contributed any capital investment, he received an ownership interest in the Liquor Store from the Partners.

42.     On or about March 2, 2012, the defendant JOHN SAMPSON and the Partners submitted a liquor license application for the Liquor Store (the "Application") to the SLA.   The Application named only Partner #1 and Partner #2 as owners of the Liquor Store. The Application did not disclose the ownership interests of SAMPSON, Partner #3 and Partner #4.

43.     During a series of telephone calls that were captured on the Sampson Wiretap, the defendant JOHN SAMPSON told the Partners that SAMPSON's ownership interest should not be disclosed in the Application.   SAMPSON and the Partners also took other steps to keep secret SAMPSON's ownership interest in the Liquor Store.   For example, during a telephone call with Partner #1 on December 15, 2011 that was captured on the Sampson Wiretap, Partner #1 referred to the names listed on a bank account he had opened for the Liquor Store and told SAMPSON, "I know that -- we gotta protect you.   You can't be there."   SAMPSON agreed that he could not.

C.     JOHN SAMPSON's Directives to a Senate Staff Member

44.     The defendant JOHN SAMPSON repeatedly directed a member of his Senate staff, an individual whose identity is known to the Grand Jury (the "Staffer"), to intervene with the T&F on behalf of the Liquor Store in order to resolve the Liquor Store's outstanding sales tax obligations, including by attempting to reduce the amount the Liquor Store owed.   At the time of his directives to the Staffer, SAMPSON had not revealed his ownership interest in the Liquor Store to the public or to his Senate staff.

45.     During a December 19, 2011 telephone call that was captured by the

Sampson Wiretap, Partner #1 and the defendant JOHN SAMPSON discussed the Liquor Store's

outstanding tax obligations to the T&F.    SAMPSON said, "We'll call the people to get these

taxes done" and indicated that the Staffer would contact the T&F.    On December 20, 2011,

during another intercepted telephone call, SAMPSON instructed the Staffer to assist Partner #1's

negotiations with the T&F regarding the Liquor Store's sales tax obligations:

| | |
|---|---|
| Sampson: | Do me a favor.    I want you to call, ah, a gentleman called [Partner #1] . . . let me give you his number, hold on. [SAMPSON provides the telephone number of Partner #1 to the Staffer] . . . . [G]ive him a call, he needs some help, ah, with, um, he has to pay a liquor [unintelligible] he has to pay the sales tax people so he just wants to see if you can negotiate the amount down a little bit. |
| The Staffer: | Okay. |
| Sampson: | Alright, see what you can do for him if you can do anything, alright. |
| The Staffer: | Alright, not a problem, alright. |
| Sampson: | You know what, um yeah, see what you can do, if anything, for him, okay alright. |

One minute after this call concluded, SAMPSON called the Staffer again.    This call also was

captured on the Sampson Wiretap.    During the call, SAMPSON instructed the Staffer to "do it

on your own cell phone and do it on your own time when you did this."    Less than two hours

later, in another intercepted telephone call, Partner #1 confirmed to SAMPSON that the Staffer

had called Partner #1.

14

46.     On December 21, 2011, during a telephone call that was captured on the Sampson Wiretap, the defendant JOHN SAMPSON repeatedly pressed the Staffer to continue lobbying the T&F on behalf of the Liquor Store:

| | |
|---|---|
| Sampson: | Yeah, they need that contact down there immediately cause they wanna know what the amount is and pay me like today . . . . |
| The Staffer: | I already spoke to the woman and gave her all his information.   I just spoke to her a few minutes ago . . . . |
| Sampson: | Just stay on top of that.   Stay on top of that for me please. |
| The Staffer: | Yeah, she said it shouldn't be an issue for him to go ahead and pay . . . . |
| Sampson: | Alright, just take care of it and make sure it happens today for me please on your own private time. |
| The Staffer: | Okay, sir. |
| Sampson: | Please. |
| The Staffer: | Yeah Senator.   I gave her all his information.   He has her number . . . . |
| Sampson: | I know that -- just make it happen, please. |
| The Staffer: | I, I, I will.   Okay. |
| Sampson: | Just make it happen, that's all I'm asking, just make it happen. |

47.     On December 28, 2011, during a telephone call that was captured on the Sampson Wiretap, Partner #1 informed the defendant JOHN SAMPSON that, earlier that morning, Partner #1 had received a telephone call from a woman at the "State Tax Department" who "referenced, you know, your office and stuff."

15

VII.   The Interview of JOHN SAMPSON

48.   On July 27, 2012, Special Agents of the FBI approached the defendant JOHN SAMPSON outside his Brooklyn residence and asked him about his involvement in, among other things, the criminal schemes described above.   During the interview, SAMPSON made the following statements in sum and substance, and in part.

A.   The Check Register Page

49.   When shown a copy of the Check Register Page, the defendant JOHN SAMPSON stated that the document "didn't ring a bell" and that he "didn't have a recollection from it."   SAMPSON also stated that he did not recall seeing the Check Register Page previously.

B.   Information Concerning the Mortgage Fraud Case

50.   The defendant JOHN SAMPSON admitted that he had asked the Employee for information on the Mortgage Fraud Case, but claimed that he only requested public information from the Employee, such as the name of the judge assigned to the Mortgage Fraud Case.   When asked why he would request public information from an employee of the USAO, when SAMPSON himself was an attorney, SAMPSON stated that he was not "good" with computers.

C.   The Liquor Store

51.   When asked if he had an ownership interest in a liquor store, the defendant JOHN SAMPSON stated that he did.   SAMPSON also stated that he did not direct a member of his Senate staff to assist Partner #1 in matters relating to the Liquor Store, and claimed that he would not pressure his staff members to make such inquiries.

16

52.     At the conclusion of the interview, the agents advised the defendant JOHN

SAMPSON that he had lied to federal agents, which constituted a federal crime.    After being

asked whether he wished to revise his statement, SAMPSON stated, "Not everything I told you

was false."

COUNT ONE
(Embezzlement - Forbell Street)

53.     The allegations in paragraphs one through fifty-two are realleged and

incorporated as if fully set forth in this paragraph.

54.     On or about February 13, 2008, within the Eastern District of New York

and elsewhere, the defendant JOHN SAMPSON, an agent of the Supreme Court, did knowingly

and intentionally embezzle, steal, obtain by fraud, misapply and otherwise without authority

knowingly convert to the use of a person other than the rightful owner, property of the

Supreme Court, an agency of state government that received benefits in excess of $10,000 under

one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance

and other forms of Federal assistance in one or more one-year periods, which property was

valued at $5,000 or more, and was owned by, and was under the care, custody and control of, the

Supreme Court, to wit: $8,000 of the Forbell Street Surplus.

(Title 18, United States Code, Sections 666(a)(1)(A) and 3551 et seq.)

COUNT TWO
(Embezzlement - Eighth Avenue)

55.     The allegations in paragraphs one through fifty-two are realleged and

incorporated as if fully set forth in this paragraph.

17

56.     On or about June 7, 2008, within the Eastern District of New York and elsewhere, the defendant JOHN SAMPSON, an agent of the Supreme Court, did knowingly and intentionally embezzle, steal, obtain by fraud, misapply and otherwise without authority knowingly convert to the use of a person other than the rightful owner, property of the Supreme Court, an agency of state government that received benefits in excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of Federal assistance in one or more one-year periods, which property was valued at $5,000 or more, and was owned by, and was under the care, custody and control of, the Supreme Court, to wit: $82,667.94 of the Eighth Avenue Surplus.

(Title 18, United States Code, Sections 666(a)(1)(A) and 3551 et seq.)

COUNT THREE
(Obstruction of Justice - Mortgage Fraud Case)

57.     The allegations in paragraphs one through fifty-two are realleged and incorporated as if fully set forth in this paragraph.

58.     In or about and between July 2011 and July 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOHN SAMPSON, together with others, did knowingly, intentionally and corruptly endeavor to influence, obstruct and impede the due administration of justice in an official proceeding, to wit: the Mortgage Fraud Case.

(Title 18, United States Code, Sections 1503(a), 1503(b)(3), 2 and 3551 et seq.)

COUNT FOUR
(Witness Tampering - Check Register Page)

59.     The allegations in paragraphs one through fifty-two are realleged and incorporated as if fully set forth in this paragraph.

60.     On or about February 22, 2012, within the Eastern District of New York, the defendant JOHN SAMPSON did knowingly, intentionally and corruptly persuade and attempt to persuade the Associate, with intent: (a) to cause and induce the Associate to (1) withhold the Check Register Page, (2) conceal the Check Register Page with intent to impair its availability for use, and (3) evade legal process summoning the Associate to produce the Check Register Page, all in connection with one or more official proceedings, to wit: (i) a grand jury investigation in the Eastern District of New York, and (ii) the Mortgage Fraud Case; and (b) to hinder, delay and prevent the communication to one or more law enforcement officers of the United States, to wit: Special Agents of the FBI and prosecutors in the USAO, of information, specifically, the Check Register Page, relating to the commission and possible commission of one or more Federal offenses, to wit: (1) federal program embezzlement, in violation of Title 18, United States Code, Section 666(a)(1)(A), as described in paragraphs five, six and fourteen through twenty-six, and as charged in Counts One and Two above, and (2) federal program bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B), in connection with the Associate Transaction as described in paragraphs six and seven.

(Title 18, United States Code, Sections 1512(b)(2)(A), 1512(b)(2)(B), 1512(b)(2)(C), 1512(b)(3) and 3551 et seq.)

19

COUNT FIVE
(Witness Tampering - Associate Transaction)

61.     The allegations in paragraphs one through fifty-two are realleged and incorporated as if fully set forth in this paragraph.

62.     On or about February 22, 2012, within the Eastern District of New York, the defendant JOHN SAMPSON did knowingly, intentionally and corruptly persuade and attempt to persuade the Associate, with intent to hinder, delay and prevent the communication to one or more law enforcement officers of the United States, to wit: Special Agents of the FBI and prosecutors in the USAO, of information, to wit: information regarding the Associate Transaction, relating to the commission and possible commission of one or more Federal offenses, to wit: (a) federal program embezzlement, in violation of Title 18, United States Code, Section 666(a)(1)(A), as described in paragraphs five, six and fourteen through twenty-six, and as charged in Counts One and Two above, and (b) federal program bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B), in connection with the Associate Transaction as described in paragraphs six and seven.

(Title 18, United States Code, Sections 1512(b)(3) and 3551 et seq.)

COUNT SIX
(Tampering with Evidence)

63.     The allegations in paragraphs one through fifty-two are realleged and incorporated as if fully set forth in this paragraph.

64.     In or about and between February 2012 and August 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOHN SAMPSON did knowingly, intentionally and corruptly conceal and attempt to conceal a

20

record, document and other object, to wit: the Check Register Page, with the intent to impair the availability of the Check Register Page for use in one or more official proceedings, to wit: (a) a grand jury investigation in the Eastern District of New York, and (b) the Mortgage Fraud Case.

(Title 18, United States Code, Sections 1512(c)(1) and 3551 et seq.)

## COUNT SEVEN
(Concealment of Records)

65.     The allegations in paragraphs one through fifty-two are realleged and incorporated as if fully set forth in this paragraph.

66.     In or about and between February 2012 and August 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOHN SAMPSON did knowingly and intentionally conceal and cover up a record, document and tangible object, to wit: the Check Register Page, with the intent to impede, obstruct and influence a matter within the jurisdiction of a department and agency of the United States, to wit: the United States Department of Justice, and in relation to and in contemplation of such matter.

(Title 18, United States Code, Sections 1519 and 3551 et seq.)

## COUNT EIGHT
(False Statement - Check Register Page)

67.     The allegations in paragraphs one through fifty-two are realleged and incorporated as if fully set forth in this paragraph.

68.     On or about July 27, 2012, within the Eastern District of New York, the defendant JOHN SAMPSON did knowingly and willfully make a materially false, fictitious and fraudulent statement and representation, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: the FBI, in that the defendant falsely

21

stated and represented to FBI Special Agents that he did not recall seeing the Check Register

Page previously, when in fact, as he then and there well knew and believed, the defendant did

recall seeing the Check Register Page previously.

(Title 18, United States Code, Sections 1001(a)(2) and 3551 et seq.)

COUNT NINE
(False Statement - Request For Nonpublic Information)

69.     The allegations in paragraphs one through fifty-two are realleged and

incorporated as if fully set forth in this paragraph.

70.     On or about July 27, 2012, within the Eastern District of New York, the

defendant JOHN SAMPSON did knowingly and willfully make a materially false, fictitious and

fraudulent statement and representation, in a matter within the jurisdiction of the executive

branch of the Government of the United States, to wit: the FBI, in that the defendant falsely

stated and represented to FBI Special Agents that he only requested public information from the

Employee, when in fact, as he then and there well knew and believed, the defendant requested

nonpublic information from the Employee.

(Title 18, United States Code, Sections 1001(a)(2) and 3551 et seq.)

COUNT TEN
(False Statements – Liquor Store)

71.     The allegations in paragraphs one through fifty-two are realleged and

incorporated as if fully set forth in this paragraph.

72.     On or about July 27, 2012, within the Eastern District of New York, the

defendant JOHN SAMPSON did knowingly and willfully make a materially false, fictitious and

fraudulent statement and representation, in a matter within the jurisdiction of the executive

22

branch of the Government of the United States, to wit: the FBI, in that the defendant falsely stated and represented to FBI Special Agents that he did not ask any member of his Senate staff to assist Partner #1 in any matter related to the Liquor Store when in fact, as he then and there well knew and believed, he had asked the Staffer, who was a member of SAMPSON's Senate staff, to assist Partner #1 in resolving the Liquor Store's outstanding sales tax balance owed to the T&F.

(Title 18, United States Code, Sections 1001(a)(2) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH SIX

73.     The United States hereby gives notice to the defendant JOHN SAMPSON that, upon his conviction of either of any of the offenses charged in Counts One through Six of this Superseding Indictment, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C), and 28 U.S.C. § 2461(c), which require the forfeiture of all property, real or personal, that constitutes or is derived from proceeds traceable to any such offenses.

74.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant JOHN SAMPSON:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

23

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendant up to the value of the forfeitable property

described in this forfeiture allegation, including but not limited to the following: any and all

pensions, annuities or other benefits to which SAMPSON may be entitled as a result of his

employment as a member of the New York State Senate, and any and all proceeds traceable

thereto.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code,

Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

FOREPERSON

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. C.131

24

F.#2012R01872
FORM DBD-34
JUN. 85

No. 13-CR-269 (S-2)(DLI)

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

*JOHN SAMPSON,*

Defendant.

# SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 666(a)(1)(A), 981(a)(1)(C), 1001(a)(2), 1503(a), 1503(b)(3), 1512(b)(2)(A), 1512(b)(2)(B), 1512(b)(2)(C), 1512(b)(3), 1512(c)(1), 1519, 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
                                                    *Foreperson*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ *day.*

*of* _ _ _ _ _ _ _ _ *A.D. 20* _ _ _ _

_____
                                                         *Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _ _

*Alexander A. Solomon, Assistant U.S. Attorney (718) 254-6074*