UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
UNITED STATES OF AMERICA,                          :
                                                   :
              -against-                            :
                                                   :          **OPINION AND ORDER**
JOHN SAMPSON,                                      :             13-cr-269 (DLI)
                                                   :
                            Defendant.             :
-----------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On July 24, 2015, the defendant John Sampson ("Defendant" or "Sampson") was convicted after a trial by jury of obstruction of justice in violation of 18 U.S.C. § 1503 (Count Two), and making false statements in violation of 18 U.S.C. § 1001 (Counts Seven and Nine). By motion dated September 14, 2015, Defendant seeks judgments of acquittal on Counts Two and Seven pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Defendant does not challenge his conviction on Count Nine. The government opposes the motion. Defendant's motion is denied in its entirety for the reasons described more fully herein.

In sum, as to Count Two, Defendant waived the argument that the indictment was defective by not raising the issue before trial pursuant to Rule 12(b)(3)(B)(v). Alternatively, even if Defendant did not waive this argument, it still would fail because Defendant was not convicted of witness tampering and there was sufficient evidence of intent and nexus for a rational jury to find Defendant guilty beyond a reasonable doubt. As to Count Seven, Defendant's arguments that his statements to the FBI were "literally true" and immaterial are not persuasive and are insufficient to overturn the jury verdict as to this count.

# BACKGROUND[1]

Defendant is an experienced civil and criminal attorney and prominent politician. As a lawyer, he represented criminal defendants and, *inter alia*, served as a court-appointed referee in real estate foreclosure proceedings. As a politician, he represented the 19th Senate District in the New York State Senate (the "Senate"), serving terms as both the leader of the Democratic Conference and Minority Leader. In 2005, attempting to combine his talents as lawyer and politician, Defendant ran unsuccessfully for Kings County District Attorney.

Defendant's legal issues arose out of his work as a court-appointed referee, where he controlled escrow accounts that held the proceeds of foreclosure sales. Defendant was responsible for applying the funds in these accounts to any outstanding mortgages, taxes, or other liens on the foreclosed properties. If a surplus remained after all creditors were satisfied, Defendant was required to remit any excess funds to the Kings County Clerk within five days of filing his referee report. Between 1998 and 2006, Defendant embezzled approximately $440,000 of these surplus funds.[2]

Around July 2006, Defendant embarked on an unsuccessful scheme to conceal this embezzlement. He approached his longtime friend, Edul Ahmad ("Ahmad"), to obtain a loan Defendant could use to replace the embezzled funds. Ahmad lent Defendant $188,500, memorializing the loan on a check register page. Defendant failed to declare the loan on his Senate financial disclosure forms as required by law. Although Sampson never repaid the loan in cash, he did provide his friend with political favors. Specifically, Defendant used his position as a state senator to interfere with state agency audits of Ahmad's real estate businesses, among

---

[1] Familiarity with the facts and procedural history of this case is presumed. The following facts are derived from the indictments, the parties' motion papers, and the trial transcript. They are provided for background purposes only.

[2] On August 12, 2015, the Court dismissed the embezzlement counts in the original indictment as time barred.

other favors.

I.    The Mortgage Fraud Case and Defendant's
      Attempts to Obtain Confidential Information

In July 2011, the United States Attorney's Office for the Eastern District of New York (the "USAO") filed a criminal complaint against Ahmad, alleging bank and wire fraud as part of a mortgage fraud scheme (the "Mortgage Fraud Case"). Shortly after his arrest on these charges, Ahmad began meeting with Sampson at Ahmad's office to discuss the Mortgage Fraud Case. Specifically, Ahmad and Sampson discussed a list of potential witnesses who they believed were cooperating with the government and might testify against Ahmad. They formulated a plan whereby they would endeavor to "find out who [the cooperating witnesses were] and … get a private investigator to dig up dirt on them." Tr. 368:25-369: 5. Ahmad testified that "dirt" meant "anything … that will negatively impact [the cooperating witnesses'] credibility." Tr. 369:6-7.

Although Sampson and Ahmad suspected that certain of Ahmad's co-conspirators were cooperators, they were not content to rely on mere supposition. Instead, they sought to confirm the identities of the witnesses against Ahmad by obtaining confidential, non-public information from three different sources: (1) a paralegal in the USAO named Samuel Noel ("Noel") who testified against Sampson at trial; (2) counsel for Ahmad's co-conspirators; and (3) a retired FBI agent named Warren Flagg ("Flagg"). Their attempts to access this information began in fall 2011 and continued through winter 2012. During this period, in November 2011, Ahmad himself began cooperating with the government, which included recording his conversations with Sampson.

A.    Samuel Noel

Noel was a close, longtime friend of Defendant and Defendant's family, who worked as a

supervisory paralegal in the USAO at the time of Ahmad's prosecution in the Mortgage Fraud Case.  In fall 2011, Sampson contacted Noel and provided him with the names of four individuals who Defendant believed were potential government witnesses.[3]  Defendant asked Noel to determine whether these four individuals were, in fact, government cooperators, and, if so, what they had told the government about Ahmad and Defendant.  Noel understood that Sampson was asking him to access non-public information from the USAO's records, and to pass that information to Sampson.  Although Noel told Sampson that he would attempt to obtain publicly available information, Noel testified at trial that this was only a "cover story."  Tr. 1703:3.  Defendant cautioned Noel not to "get [himself] jammed up," which Noel interpreted as a warning not to get caught accessing non-public information.  Tr. 1702:4-6.

During a recorded conversation with Ahmad, Sampson stated that Noel needed to be "careful," because he was providing Sampson with "information that he's not legally [unintelligible] …."  GX 502T at p. 3.  Sampson also told Ahmad that he was not sure if Noel was being "watch[ed]," and that Sampson did not "want to jeopardize [Ahmad's case] when they catch [Noel] looking at something and ask him a whole big question."  *Id.* at 3-4.  Sampson also engaged in numerous counter-surveillance measures, such as refusing to talk about Noel on the telephone (GX 501T at 6:43-7:1-2, Tr. 415:18-22), writing notes to Ahmad instead of speaking out loud (Tr. 390:2-3), and demanding that Ahmad remove the batteries from his cellular telephone before conversation (Tr. 472:11-13).

On September 19, 2011, Noel used his government-issued identification and password to search a public database known as Public Access to Court Electronic Records, or "PACER." Noel ran searches using the names, Ahmad, Sampson, and Shapiro.  After finding Ahmad's case,

---

[3] The names of these four individuals are Leesa Shapiro ("Shapiro"), Glenn Hirsch ("Hirsch"), Premrah Hansraj ("Hansraj"), and Roger Khan ("Khan").

Noel discovered that Assistant United States Attorney Alex Solomon ("AUSA Solomon") was the prosecutor assigned to the case, and that Ahmad was being prosecuted for mortgage fraud.

Noel also used his government account to access another database, the Legal Information Office Network System, or "LIONS." LIONS is a non-public, Department of Justice database that contains the names of individuals who have been charged with crimes or are under investigation. Noel searched LIONS for the names, Ahmad, Khan, Hansraj, Sampson, and Shapiro, but only found results for Ahmad, Khan and Hansraj. Noel then called Defendant to inform him that he had not found Sampson's name in the system.

Noel then spoke with the paralegal assigned to AUSA Solomon, Joyetta Brazil ("Brazil"), about Defendant and the Mortgage Fraud Case. Specifically, Noel asked Brazil to notify him if she discovered "any information on the [Mortgage Fraud Case] … or information related to [Defendant] …." Tr. 1714:23-25. He also requested that Brazil leave open any relevant USAO files for Noel's inspection. When Brazil did not leave out any files, Noel followed up by calling Brazil and leaving a voice message. Noel did not receive a response to his voice message, and he did not pursue the matter further with Brazil.

Noel also approached Melissa Bennett ("Bennett"), a USAO paralegal working in the public corruption section whom Noel supervised. Noel asked Bennett to inform him if she "came across any names of these people, talking anything about [Defendant]." Tr. 1718:2-6. Noel's intent in making this request was to "look through whatever records [were] available," and pass along any relevant information he discovered to Defendant. Tr.1718:10-12. However, despite these efforts, Bennett did not provide Noel with any information, and Noel never followed up with her about it.

During two separate visits to Defendant's home, Noel spoke with Defendant about his

attempts to obtain confidential government information concerning the Mortgage Fraud Case. On the first of these visits, which occurred sometime during fall 2011, Sampson arranged for Noel to speak with Ahmad over the telephone. During the course of that conversation, Ahmad thanked Noel for his efforts,[4] and Noel informed Ahmad that he would continue to try to get information about the Mortgage Fraud Case. During the second visit, which occurred in December 2011, Sampson asked Noel if he had obtained any information and Noel replied that he had not.

B.    Counsel for Ahmad's Co-Conspirators

Sometime during summer or fall 2011, Ahmad learned that the FBI had questioned one of his co-conspirators, Qayaam Farrouq ("Farrouq"). Ahmad became concerned that, if Farrouq was arrested, he would cooperate with the government against Ahmad. This concern prompted Ahmad to ask Sampson if he could recommend an attorney to represent Farrouq. Ahmad believed that Sampson's recommended attorney would provide Ahmad and Sampson with attorney-client communications about whether Farrouq was cooperating with the government. Sampson agreed to the proposal, and arranged for an attorney named Michael Mays ("Mays") to represent Farrouq. Sampson stated that he would communicate with Mays, and instructed Ahmad not to communicate with Mays for fear that doing so might "implicate" Ahmad. Tr. 383:25. After Farrouq's arrest on November 22, 2011, Mays represented Farrouq at the arraignment and detention hearing, but the representation terminated shortly thereafter on December 9, 2011. Sampson communicated with Mays about Farrouq and other mortgage fraud co-conspirators, but Defendant never learned any privileged information.

---

[4] Generally, Ahmad and Noel testified consistently concerning the details of this conversation. However, on the issue of whether Ahmad thanked Noel for his efforts, Ahmad stated that he did not recall thanking Noel, while Noel claimed he did.

On November 22, 2011, the same day Farrouq was arrested, law enforcement authorities arrested two other co-conspirators, Nazir Gurmohamed ("Gurmohamed") and Steve Massiah ("Massiah"). During a meeting with Ahmad later that day, Sampson attempted to have a lawyer named John Rodriguez ("Rodriguez") represent Gurmohamed in order to "keep an eye on him." GX 502T at p. 17. In other words, Defendant sought to arrange the Rodriguez representation for the same reason he arranged the Mays representation: to learn whether one of Ahmad's co-conspirators was cooperating with the government. Ultimately, Rodriguez never represented Gurmohamed, and Ahmad never received any confidential information from Rodriguez.

C.      Warren Flagg

The third avenue through which Defendant and Ahmad attempted to access non-public information about the Mortgage Fraud Case was Flagg, a retired FBI special agent who worked as a private investigator. In a recorded conversation, Sampson suggested that Ahmad hire a former FBI agent, because doing so would "open doors we can't get in." GX 506T at p. 22. Ahmad testified that he understood Sampson's reference to "opening doors" to indicate that a former FBI agent could obtain non-public information.

On February 28, 2012, Ahmad and Sampson met with Flagg, and the three discussed the Mortgage Fraud Case. During the conversation, which was recorded, Flagg told Defendant and Ahmad that, with respect to potential cooperating witnesses, they should be "very careful" not to engage in witness tampering. GX 510T at p. 2. Flagg also emphasized that the government would eventually be required to produce "3500 material,"[5] which would contain information about cooperating witnesses. When Ahmad asked if there was "any way of finding out who's testifying against [me]," Flagg replied: "Not until the 3500 material – you don't want to do that."

---

[5] "3500 material," or "Jencks Act" material, refers to information that the government is required to produce to the defense pursuant to 18 U.S.C. § 3500. Such information normally includes the statements of cooperating witnesses.

*Id.* at 2-3.

On March 5, 2012, during a recorded telephone conversation with Sampson, Ahmad expressed reluctance about retaining Flagg, given Flagg's unwillingness to obtain non-public information. In response, Sampson stated that Flagg "will help us get the information that we need." GX 511T at p. 1. Ahmad repeatedly emphasized that he wanted information about witnesses "now," before the government was required to produce 3500 material. *Id.* Because Flagg was averse to obtaining that information before the government's 3500 production, Ahmad saw no reason to hire him. Throughout the conversation, Sampson repeatedly sought to mollify Ahmad's concerns, stating that "[Flagg] will do it now" and that Flagg was "ready to go in." *Id.* At the end of the conversation, Sampson concluded by saying: "You always gotta have somebody who always plays, plays between the lines, but you also have to have somebody who knows the gray area. [Flagg] knows the gray area. And he knows people in [the USAO]." *Id.* at 5. Ahmad testified at trial that he understood Sampson's statements to mean that Flagg would obtain non-public information from his contacts in law enforcement and the USAO.

## II.     Ahmad and Sampson Discuss Murdering Cooperating Witnesses

According to Ahmad, in October 2011, Sampson told him that if Sampson "ever found out who the cooperators are, he would take them out." Tr. 392:2-16. After Ahmad himself began cooperating with the government, the FBI instructed him to ask Sampson about this statement, to test whether Sampson was serious about murdering witnesses. On December 30, 2011, Ahmad recorded the following conversation:

> Ahmad: Let me ask you something. Remember the day you came to my office, and I never forget that day. And you say if we find out who's going to testify against me, you'd fucking kill them?
>
> Sampson: Yeah.

Ahmad:  Listen, it get to a point, okay, if I find out – that's why I want you to talk to your guy – let me find out who is testifying against me.  Okay?

Sampson:  We ain't going to kill – we ain't killing nobody.  Now what are you talking about, man?

Ahmad:  You think I wouldn't fucking kill –

Sampson:  No, you ain't killing nobody, man.  Come on, that's bullshit.  Come on, man.  That's bullshit.  You know you, you know you're a harmless – come on, man.

Ahmad:  No, you, not me.  You –

Sampson:  Come on, you know that, man.  You're a harmless motherfucker.

Ahmad:  Yeah.  No, I get the point, I get the point.  Come on.

GX 506T at p. 27.

Following this exchange, Ahmad and Defendant laughed and went on to discuss other topics.

III.    The Check Register Page

As part of Ahmad's cooperation with the government, the FBI instructed Ahmad to create a phony, duplicate version of the original check register page Ahmad used to memorialize the $188,500 loan to Sampson.  On February 22, 2012, Ahmad met Sampson at a Queens restaurant and showed him the duplicate check register page.   Ahmad informed Sampson that the government had subpoenaed Ahmad's records, and that he believed the check register page was responsive.  Ahmad then sought Defendant's advice on how to proceed.  Sampson told Ahmad to withhold the check register page, and further instructed Ahmad on how to conceal the existence of the check register page, as well as the loan itself.  In the event the government independently discovered the loan, Sampson told Ahmad to state falsely that the $188,500 was payment for

legal services previously rendered by Sampson for Ahmad.[6] Defendant then took the duplicate check register page from Ahmad, placed it in his jacket pocket, and did not return it. The FBI recorded the entire conversation on video and audio, and the government played them for the jury at trial.

Later, on February 22, 2012, during a recorded telephone conversation, Ahmad told Sampson that Sampson had the only copy of the check register page. In fact, at that time, there existed three versions of the check register page: the original check register page (the "Original Register Page," GX 5), the duplicate check register page (the "Duplicate Register Page," GX 6A), and a photocopy of the Duplicate Register Page the government made before the restaurant meeting on February 22, 2012 (the "Photocopy Register Page," GX 6). The Photocopy Register Page was printed on a standard sized copy paper (eight and one-half inches wide by eleven inches tall). By contrast, the Duplicate Register Page was created on check paper (approximately four inches wide by eight and one-half inches tall) and bore watermarks.

IV.    Defendant's False Statements

On July 27, 2012, FBI agents interviewed Sampson in front of his Brooklyn home. During this interview, FBI Special Agent Kenneth Hosey ("Special Agent Hosey") showed Sampson the Photocopy Register Page, and asked him if he had ever seen it before. At trial, Special Agent Hosey testified concerning the following exchange with Sampson:

Q:  And what was the defendant's response when you asked him if he had seen the check register page before?

A:  When I asked him if he had seen it before, he said he had not.

Q:  Did the defendant appear to you to have any problem understanding your question

---

[6] Sampson never performed any legal work for Ahmad, although when state banking officials attempted to seize Ahmad's real estate transaction records, Defendant interceded on Ahmad's behalf and, *inter alia*, created a phony affidavit shifting blame for any documentary irregularities to Hansraj.

regarding whether he'd seen this check register page before?

A:  No.  In fact, he said – his quotes were it didn't ring a bell, and he didn't have a recollection from it.

Q:  Did he ask for any clarification regarding the question you asked about the check register page?

A:  He said if he could check his files or there was more information, he may be able to recall …

Q:  Did you ask the defendant again if he had a recollection of seeing the check register page before?

A:  Yes.

Q:  What did he say?

A:  He stated he did not.

Tr. 2054:10-2055:11.

In August 2012, Defendant and his counsel met with the USAO.  During this meeting, Defendant stated that he was concerned that the $188,500 loan would be perceived as a "quid pro quo for political favors."  Tr. 2114:11-13.  He further admitted that he did not want the public or the government to know about the loan.  Also during this meeting, Defendant's counsel gave Special Agent Hosey the Duplicate Register Page that Sampson had taken from Ahmad on February 22, 2012.

V.      The Indictment

The operative indictment in this case is the sixth superseding indictment, dated March 17, 2015 (the "S-6 Indictment, Dkt. Entry No. 120-2).  The S-6 Indictment contains a heading titled "JOHN SAMPSON's Obstruction of Justice," (the "Heading"), underneath which are subheadings titled "A. JOHN SAMPSON's Use of a USAO employee to Obstruct Justice" ("Subheading A"), and "B.  JOHN SAMPSON's Witness Tampering and Evidence Tampering"

("Subheading B"). *Id.* at 6-7. Subheading A, as the title suggests, discusses Sampson's attempts to obtain non-public information from Noel, and includes the following sentence: "During one meeting, SAMPSON told the Associate [Ahmad] that, if SAMPSON and the Associate were able to identify the [cooperators in the Mortgage Fraud Case], SAMPSON could arrange to 'take them out.'" *Id.* Subheading B details the February 22, 2012 restaurant meeting between Ahmad and Sampson, as well as their discussion of the check register page.

Count Two of the S-6 Indictment realleges paragraphs one through forty-one, and further alleges that "[i]n or about and between July 2011 and July 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOHN SAMPSON, together with others, did knowingly, intentionally, and corruptly endeavor to influence, obstruct and impede the due administration of justice in an official proceeding, to wit: the Mortgage Fraud Case." *Id.* at 14. Counts Three and Four, the witness tampering charges, also reallege paragraphs one through forty-one, and further charge Sampson with witness tampering pursuant to 18 U.S.C. § 1512 in connection with the February 22, 2012 restaurant meeting.[7]

## DISCUSSION

### I. The Legal Standard

Rule 29 "imposes a heavy burden on the defendant, whose conviction must be affirmed 'if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]'" *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). For a defendant to succeed on a post-trial motion for a judgment of acquittal, the Court must find that "the evidence that the

---

[7] Each indictment before the S-6 Indictment, *i.e.*, the original indictment and the other five superseding indictments, contains all of the same language quoted in this paragraph from the S-6 Indictment.

defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir.1999) (internal quotation marks and citation omitted).  A court's conclusion that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt" must be based on its consideration of "all of the evidence, direct and circumstantial[.]"  *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (citation omitted).

On a post-verdict motion for a judgment of acquittal, a trial court may not "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury."  *Cote*, 544 F.3d at 99 (internal quotation and typographical marks omitted). Instead, "[t]he court must give full play to the right of the jury to determine credibility, and must draw all possible inferences in favor of the government."  *Id.*; *see also United States v. Anderson*, 747 F.3d 51, 60 (2d Cir.2014) ("[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence.").  In other words, the court must "[v]iew[] the evidence in the light most favorable to the government," which means "crediting every inference that the jury may have drawn in favor of the government, and recognizing that the government's evidence need not exclude every other possible hypothesis."  *Eppolito*, 543 F.3d at 45 (internal quotation marks and citations omitted).  However, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty."  *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (internal quotation marks and citations omitted).

II.      Count Two – Obstruction of Justice, 18 U.S.C. § 1503

A.      Defendant Waived One of His Arguments With Respect to Count Two

i.      The Parties' Arguments

Defendant's first argument with respect to Count Two is that he was improperly convicted under § 1503, "based on acts taken in connection with witnesses." Def. Mem. at 16. Defendant cites *United States v. Hernandez*, 730 F.2d 895 (2d. Cir. 1984) and *United States v. Masterpol*, 940 F.2d 60 (2d Cir. 1991) for the proposition that a criminal defendant accused of witness tampering may be convicted under 18 U.S.C. § 1512, but may not be convicted under § 1503. *Id.* at 16-19. Accordingly, Sampson argues that, because he was convicted under § 1503 for witness tampering, his conviction should be reversed. *Id.*

In response, the government contends that Defendant waived this argument by not raising it before trial pursuant to Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure. Gov't Opp. at 12-15. The government cites the version of Rule 12(b) in effect prior to December 1, 2014 ("2014 Rule 12(b)"),[8] which states:

> (3) The following must be raised before trial:
>
> (B) a motion alleging a defect in the indictment or information – but at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or state an offense[.]

The government notes that, under 2014 Rule 12(b), a defect in the indictment must be raised before trial, whereas a claim that the indictment fails to state an offense may be raised at any time. Gov't Opp. at 13. Because Sampson claims he was charged with witness tampering under the wrong statute, he alleges the indictment is defective. *Id.* at 13-14. As such, the government contends, Rule 12(b) mandates that he should have raised issue before trial. *Id.* at 14.

Defendant agrees with the government's citation to 2014 Rule 12(b). Def. Rep. at 7, n.6.

---

[8] For clarity, the Court does not intend to convey that this version of Rule 12(b) was in effect in 2014 only. The Court takes judicial notice of the fact that this version of Rule 12(b) was in effect between December 1, 2002 and November 31, 2014. The Court uses the term "2014 Rule 12(b)" for convenience only.

Further, Defendant agrees with the government that a defect must be raised pretrial and a motion for failure to state an offense can be made at any time.  *Id.*  However, Sampson disagrees with the government's contention that his argument alleges a defect in the indictment.  *Id.*  Instead, he presents his argument as a failure to state an offense, because § 1503 does not criminalize the conduct for which he allegedly was charged and convicted, witness tampering.  *Id.*  Thus, he claims that he properly may raise the issue "at any time."  *Id.* (quoting 2014 Rule 12(b)).  In the alternative, Sampson contends that, even if the Court construes his argument as raising a defect, there still is no waiver because said defect was not apparent until trial.  *Id.* at 8 (citing *United States v. Sturdivant*, 244 F.3d 71, 76 (2d Cir. 2001) and *Freeman v. United States*, 2010 WL 4026067, at *6 (S.D.N.Y. Oct. 14, 2010)).

      ii.      The Version of Rule 12(b) Effective December 1, 2014
                          ("2015 Rule 12(b)") Applies in Determining the Waiver Issue

According to Sampson, 2014 Rule 12(b) controls in this instance because Sampson's pretrial motions were due before December 2014.[9]  This argument rests on the erroneous assumption that *all* of his pretrial motions were due by November 31, 2014.  In fact, the record shows that *motions in limine that could have been made at that time* were due by December 1, 2014.

At a status conference dated October 31, 2014, the following exchange occurred:

THE COURT: What I would like to do is propose a schedule for motions in limine. Can those motions be in by November 14th?

MR. SOLOMON: Your Honor, I'm on trial for the next two weeks. If we can have a week after that?

THE COURT: You have able co-counsel that can work on the motions in limine. The problem is that I'm going to be on trial as well, and I have committed time, plus there are the holidays. I will give you to the 21st.

---

[9] The government does not explain why it used 2014 Rule 12(b).

MR. TUCHMANN: Thank you, your Honor.

THE COURT: That will be for a simultaneous schedule, that is for the defense as well. Will that work for you, too?

MR. AKERMAN: If we could have December 1st, because we have a number of things going on.

THE COURT: All right. December 1st will be for the motions in limine….

Tr. of Oct. 31, 2013 Conf. at 19:10-20:1.

First, the Court clearly directed the parties to file their *motions in limine*, not all pretrial motions, by December 1, 2014. Motions in limine are one type of pretrial motion, but not all pretrial motions are motions in limine. *Motion in Limine*, BLACKS LAW DICTIONARY (10th ed. 2014) ("A pretrial request that certain inadmissible evidence not be referred to or offered at trial."). The grand jury returned three additional superseding indictments after December 1, 2014, including the S-6 Indictment, dated March 17, 2015, which was the indictment upon which this case was tried. Suppose the S-6 Indictment included an additional count charging Defendant with an unrelated murder. Obviously, the December 1, 2014 deadline for motions in limine would not have prevented Defendant from filing a motion to dismiss that erroneous count of the indictment after the deadline had lapsed.

Second, the Court directed the parties to file their motions in limine by December 1, 2014, not "prior to December 2014" as Defendant contends. This matters, because the effective date of 2015 Rule 12(b) was December 1, 2014. *See* 2014 Rule 12(b) ("Text of subsection (b) effective December 1, 2014, absent contrary Congressional action."). Accordingly, even if the Court had directed the parties to file any and all pretrial motions by December 1, 2014, which it did not, 2015 Rule 12(b) would still apply.

Finally, the parties exchanged a substantial amount of correspondence and discovery

*after* December 1, 2014, some of which generated two additional motions in limine from the government, dated May 14, 2015 and June 2, 2015, respectively, (Dkt. Entry Nos. 141 and 151). The Court did not preclude these motions because the government did not have the necessary information before December 1, 2014. Certainly, had Defendant filed any motions in limine after December 1, 2014 based on information acquired on or after that date, the Court would have considered them as well. Accordingly, the Court rejects the notion that *all* motions in limine, much less all pretrial motions, were due before December 1, 2014.

In short, Sampson complains that the S-6 Indictment, which is the operative indictment in this case, failed to state an offense or provide adequate notice. The S-6 Indictment is dated March 17, 2015, and the record reflects that the Court did not prevent Sampson from filing pretrial motions at that time, or at any time before trial. Accordingly, the Court will analyze the S-6 Indictment using the version of Rule 12(b) in effect at the time the S-6 Indictment was returned.

### iii.    Defendant Waived His Argument Under 2015 Rule 12(b)

2015 Rule 12(b) states, in relevant part:

(2)  Motions That May Be Made at Any Time.

A motion that the court lacks jurisdiction may be made at any time while the case is still pending.

(3)  Motions That Must Be Made Before Trial.

The following defenses, objections, and requests must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits:

(B)  a defect in the indictment or information, including:

(v) failure to state an offense[.]

The differences between 2014 Rule 12(b) and 2015 Rule 12(b) are material. Under 2015

Rule 12(b), the only issue a defendant may raise "at any time" is that the court lacks jurisdiction. A claim that the indictment fails to state an offense is now treated as a defect that must be raised before trial. Thus, the parties' disagreement over whether Defendant's argument raises a defect or a failure to state an offense is moot; per the version of Rule 12(b) currently under consideration, an allegation that an indictment fails to state an offense *is* an allegation that the indictment is defective.

The issue before the Court is whether Defendant waived his ability to raise this alleged defect by not doing so before trial. To determine this question, the Court must look to the introductory language of 2015 Rule 12(b)(3), which provides that a defect in the indictment must be raised before trial if: (i) "the basis for the motion is then reasonably available"; and (ii) "the motion can determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3); *see also United States v. Walsh*, 2016 WL 211916, at *3 (E.D.N.Y. Jan. 15, 2016) (quoting Fed. R. Crim. P. 12(b)(3)(B)(v) ("Fed. R. Crim. P. 12(b)(3)(B)(v) provides that a defendant can raise a defect in the indictment for 'failure to state an offense' prior to trial 'if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits.'").

As to the "reasonably available" basis prong, Defendant argues that he did not know, based on the face of the S-6 Indictment, what evidence the government would offer in support of Count Two.[10] Def. Rep. at 9 ("Count Two is worded in broad, general terms …."); *Id.* ("Count Two also incorporated all prior paragraphs in the [S-6 Indictment], underscoring its ample breadth."). He also claims that the speaking portion of the S-6 Indictment did not forewarn him

---

[10] Because Defendant made his arguments under 2014 Rule 12(b), he did not claim specifically that the basis for his motion was not "then reasonably available." Instead, he argued, pursuant to *Sturdivant's* construction of 2014 Rule 12(b), that the "defect in the indictment was not apparent on its face." Whether a defect in an indictment was not "reasonably available" before trial, or was "not apparent" before trial, raises the same question. Accordingly, the Court will construe Defendant's argument as alleging that the "basis for the motion was not then reasonably available," pursuant to 2015 Rule 12(b).

of the government's intention to "argue Sampson committed witness tampering in connection with Count Two." *Id.* at 10. This lack of notice, he maintains, was a byproduct of the S-6 Indictment's "counterintuitive" organization. *Id.* (observing that the "allegations relating to charges *other* than Count Two appeared under the heading 'Witness Tampering'….") (emphasis in original).

To the extent Defendant attacks the S-6 Indictment as overly "broad," he essentially argues that it was vague or "insufficiently specific." *United States v. Crowley*, 236 F.3d 104, 108 (2d Cir. 2000). Even if the Court agreed with this characterization, knowledge of this supposed defect was more than "reasonably available" before trial. The S-6 Indictment currently at issue is the same document Defendant reviewed before trial; so if that document is vague now, then it was vague then, which is when Defendant should have voiced his concerns. *Crowley*, 236 F.3d at 108 ("Federal Rule of Criminal Procedure 12(b)(2) explicitly provides that a claim that an indictment is insufficiently specific 'must be raised prior to trial.'" (quoting FED. R. CRIM. P. 12(b)(2))); *United States v. Spero*, 331 F.3d 57, 61 (2d Cir. 2003) (because claim that indictment was "insufficiently specific … was not raised prior to trial, as unambiguously required by the law of the Circuit, the claim must be rejected." (citing *Crowley*, 236 F.3d at 108)). *Crowley* explained that defendants must raise specificity challenges before trial because:

> This mandate is no mere pleading technicality. Rather, it serves a number of important purposes, including deterrence of gamesmanship—Rule 12(b)(2) prevents a defendant from deciding whether to object to an indictment's purported lack of specificity based solely on whether he is convicted or acquitted—and insuring that indictments are not routinely challenged (and dismissed) after the jury has been seated and sworn, a result that would waste jurors' time and force courts frequently to confront complex Double Jeopardy questions.

*Id.* (citing *Davis v. United States*, 411 U.S. 233, 241 (1973)).

Although *Crowley* interpreted a prior version of Rule 12(b), this rationale applies with equal force here, where the jury sat attentively throughout a trial that lasted over one month. If Sampson was concerned at all about the S-6 Indictment's "ample breadth," the time to raise that issue was before the considerable expenditure of time and resources occasioned by this trial. Accordingly, the Court will not permit Defendant to raise a vagueness argument at this late stage, as doing so would subvert the letter of Rule 12(b)(3)(B)(v) and the rationale supporting it.

Sampson also complains that the "counterintuitive" organization of the S-6 Indictment did not put him on notice that the government would argue witness tampering under Count Two. Def. Rep. at 10. He highlights the fact that the government charged witness tampering under Counts Three and Four, not Count Two. *Id.* He further notes that the factual allegations under Subheading B ("JOHN SAMPSON'S Witness Tampering and Evidence Tampering") are unrelated to Count Two. *Id.* In short, he claims that the face of the S-6 Indictment discloses no connection between witness tampering and Count Two.

The problem with this argument is that it simply fails to account for the following sentence: "During one meeting, SAMPSON told [Ahmad] that, if SAMPSON and [Ahmad] were able to identify the [cooperating witnesses in the Mortgage Fraud Case], SAMPSON could arrange to 'take them out.'" This sentence appears under Subheading A ("JOHN SAMPSON'S Use of a USAO Employee to Obstruct Justice"), which obviously relates to Count Two. Thus, the S-6 Indictment presents an allegation that Sampson would "take out," *i.e.*, tamper with, witnesses under a subsection that clearly supports Count Two. It is irrelevant that the evidence presented at trial undermined this allegation because the issue here concerns the information available from the face of the indictment. The face of the S-6 Indictment alleged, in support of

Count Two, that Sampson offered to tamper with witnesses by "tak[ing] them out." Accordingly, Sampson's "counterintuitive" organization argument fails.

The second prong of the 2015 Rule 12(b)(3) introductory language is whether "the motion can be determined without a trial on the merits." As discussed above, the issues Sampson raises presently could have been determined by examining the face of the S-6 Indictment. Certainly, the parties and the Court were capable of such a legal analysis "without a trial on the merits."

Based on the foregoing, the Court finds that Sampson waived the argument that he was convicted improperly under § 1503. However, in the alternative, the Court will address the substantive merits of this argument. Defendant's claim still fails.

> B.     <u>Defendant Was Not Convicted Improperly of Witness Tampering</u>

Defendant advances two arguments concerning his allegedly improper conviction under Count Two for witness tampering. First, Sampson argues that, under *Hernandez* and *Masterpol*, his § 1503 conviction should be vacated, because it was based on "witness related conduct," or "acts taken in connection with witnesses." Def. Rep. at 5; Def. Mem. at 16. Second, Defendant complains that the government improperly urged the jury to convict him of witness tampering during its summation. Def. Rep. at 2-5. Both arguments lack merit.

In *Hernandez*, the Second Circuit held that a defendant was convicted improperly under § 1503 because his conduct, threatening a witness, was not proscribed by that statute. 730 F.2d at 899. The court focused its analysis on the changes made to the text of § 1503 by the Victim and Witness Protection Act of 1982 (the "Act"). *Id.* at 898. Specifically, the court found that the Act "removed from § 1503 all references to witnesses, leaving that section to protect jurors and court officers, and enacted a new section, § 1512, addressed specifically and in more detail to the

protection of witnesses, informants, and crime victims from intimidation." *Id.*

The government in *Hernandez* argued that Congress enacted § 1512, "in effect, to create two crimes, making witness intimidation and harassment punishable not only under § 1512, but also under the residual clause of § 1503." *Id.* Rejecting this argument, the court found that "congress affirmatively intended to remove witnesses entirely from the scope of § 1503." *Id.* Accordingly, because the defendant was convicted under § 1503 for witness intimidation, the court reversed.

The Second Circuit reaffirmed this holding in *Masterpol*, where the defendant, like the defendant in *Hernandez*, was convicted under the residual clause of § 1503 for witness tampering. 940 F.2d at 761. The government in *Masterpol* attempted to distinguish *Hernandez* on the ground that Masterpol engaged in non-coercive witness tampering, while Hernandez had used coercion. *Id.* at 762. The court rejected this argument, noting that, "in view of … the plain import of Congress' action in both adopting section 1512 and deleting from section 1503 all references to witnesses, we see no reason at this juncture to retreat from the position we took in *Hernandez*…." *Id.*[11]

Defendant's argument, that *Hernandez* and *Masterpol* prohibit § 1503 convictions based on "witness related conduct," depends on an excessively broad construction of those opinions. In fact, the sheer breadth of the phrase "witness related conduct" renders it essentially meaningless, which is presumably why it does not appear in any of the cases cited by Defendant. What *Hernandez* and its progeny actually forbid are § 1503 convictions based on conduct

---

[11] *Hernandez* and *Masterpol* represent the minority position among the other federal appellate courts to have considered the issue. *See United States v. Fortunato*, 2003 WL 21056974, at *2 (E.D.N.Y. Mar. 10, 2014) (citing cases). Nevertheless, the holdings from these cases remain the law of this circuit. *See United States v. Kumar*, 617 F.3d 612, 622, n.9 (2d Cir. 2010) (reaffirming the holding of *Masterpol* that "witness tampering is prohibited only by § 1512, and is not covered by § 1503's omnibus clause"); *United States v. Russo*, 302 F.3d 37, 42-43 (2d Cir. 2002) (same); *United States v. Gabriel*, 125 F.3d 89, 105 n.12 (2d Cir. 1997) (same).

proscribed by § 1512, *i.e.*, witness tampering.

As Defendant correctly observes, the conduct supporting Count Two consisted of Sampson's efforts to: (1) solicit Noel to ascertain information about witnesses; (2) arrange for certain attorneys to represent potential witnesses against Ahmad; and (3) hire Flagg to obtain confidential information about witnesses. Def. Mem. at 18-19. That such conduct may be categorized as "witness related" is both obvious and irrelevant. The conduct at issue in *Hernandez*, *Masterpol*, and every subsequent Second Circuit case to consider the issue was witness tampering, a behavior far more circumscribed than the nebulous "witness related conduct." *See Hernandez*, 730 F.2d at 897 (defendant threatened to kill a witness); *Masterpol*, 940 F.2d at 761 (defendant urged witnesses to make false statements); *Russo*, 302 F.3d at 40 (affirming district court's dismissal of § 1503 conviction for secreting witness subpoenaed by grand jury); *Kumar*, 617 F.3d 612, 622, n.9 (finding witness bribery not punishable under § 1503 pursuant to *Masterpol*, but also finding that lying to SEC investigators, *i.e.*, conduct other than witness tampering, is properly charged under § 1503).

Defendant emphasizes one sentence from *Hernandez* that states, when Congress enacted § 1512, it "affirmatively intended to remove witnesses entirely from the scope of § 1503." Def. Mem. at 17 (quoting *Hernandez*, 730 F.2d at 898). Taken out of context, this language arguably supports Defendant's position that "witness related conduct" may not be prosecuted under § 1503. However, this argument ignores the fact that the sentence quoted by Defendant appears within *Hernandez's* broader discussion of Congressional intent. *Id.* In the paragraph immediately preceding the "remove witnesses entirely" language, *Hernandez* found that Congress "delet[ed] from §1503 all references to witnesses," to clarify that "threats against witnesses would fall *solely* under § 1512." *Id.* (emphasis added)*; see also Id.* (rejecting

argument that Congress intended to create two crimes for witness tampering). In other words, Congress completely excised all witness related *words* from the language of § 1503 for the purpose of punishing witness tampering under § 1512 *only*. Congress did not intend to alter the conduct being criminalized; it simply removed that prohibited conduct from one section of the statute (§ 1503) and placed it in another (§ 1512).[12]

Next, Defendant argues that he was convicted on Count Two for witness tampering, as opposed to "witness related conduct," based on the government's summation. Def. Rep. at 2-5. He highlights the following portion of the government's summation as especially prejudicial:

> So what was [Sampson] trying to accomplish by trying to get all of this confidential information from Noel, from [Mays], and the other attorneys, and from Flagg? He was trying to get an unfair advantage for Ahmad in Ahmad's case, trying to give Ahmad more time than Ahmad had a right to have to dig up dirt on cooperating witnesses, trying to give Ahmad the names and identities of cooperating witnesses so Ahmad could *tamper with them. You saw the defendant tamper with witnesses* in this case; he knew how it's done. What else was the defendant trying to accomplish? He was trying to give Warren Flagg the opportunity to do dirty work with cooperating witnesses in the gray area, not between the lines, things that Ahmad's real attorney shouldn't know about. All of this evidence shows that the defendant is guilty of Count Two, endeavoring to obstruct Ahmad's case.

*Id.* at 3 (citing Tr. 2294:9-2296:1) (emphasis Defendant's).

From this, Defendant draws the conclusion that "the government emphasized repeatedly that Sampson's conduct amounted to witness tampering." *Id.* at 3. Defendant completely misconstrues the government's argument.

The government did not contend at trial, nor does it contend now, that Defendant tampered with witnesses or attempted to tamper with witnesses in connection with Count Two.

---

[12] *Masterpol* also quotes *Hernandez's* statement that "congress affirmatively intended to remove witness entirely from the scope of § 1503." *Id.* at 763 (quoting *Hernandez*, 730 F.2d at 898)(quotation marks omitted). However, just as in *Hernandez*, this quote appears in *Masterpol* as part of a broader discussion of Congressional intent, specifically Congress's 1988 amendments to § 1512. *See Id.*

Rather, the government has consistently argued that Sampson's *corrupt purpose* was to tamper with witnesses. This is readily apparent from the block quote above, wherein the government argued that Sampson attempted to provide witness information to Ahmad "*so* Ahmad could tamper with them." Tr. 2294:9-2296:1 (emphasis added). In other words, the government argued that Sampson gave Ahmad witness information for the purpose of facilitating Ahmad's potential witness tampering. The mere appearance of the term "witness tampering" within this quote does not mean the government urged the jury to convict Sampson under Count Two for the substantive crime of witness tampering.

In response, Defendant counters that the government conflated the *mens rea* and *actus reus* elements of Count Two before the jury. Def. Rep. at 4 ("The government attempts to justify its position that Sampson was not convicted of witness tampering … by contending that evidence and arguments relating to witnesses were offered to establish corrupt intent, not *actus reus*. However, the government did not explain this distinction to the jury."). In fact, it is Defendant who obfuscates the difference between witness tampering as a corrupt purpose, and witness tampering as the *acts reus* of the obstruction charge. One of the more egregious examples from Defendant's reply brief will illuminate this point.

Defendant notes that, during its summation, the government "argued it was 'witness tampering' for Sampson to arrange for 'close associates like Michael Mays to represent people like Qayaam Farrouq.'" Def. Rep. at 3 (quoting Tr. 2412:1-3). The entire sentence from the transcript actually reads: "And when [Sampson] is arranging for close associates like Michael Mays to represent people like Qayaam Farrouq, that's witness tampering, *that's a corrupt purpose*." Tr. 2412:1-4 (emphasis added). Moreover, this quote appears in the middle of the government's broader argument concerning Sampson's corrupt purpose. That portion of the

government's summation, in which it clearly and repeatedly urged the jury to find that Sampson acted with a corrupt purpose, covers five pages of the transcript. *See* Tr. 2410:2-2415:24 (mentioning the phrase "corrupt purpose" 14 times and "witness tampering" once). The government's singular misuse of the phrase "witness tampering" in this context appears to have been inadvertent, and in any event, was clearly immaterial and non-prejudicial. Defendant's misguided attempt to portray the government's argument as something other than what it was is unavailing.

     C.     <u>The Government Presented Sufficient Evidence of Intent and Nexus</u>

          i.     <u>A Rational Jury Could Have Found</u>
                   <u>Defendant Acted With a Corrupt Intent</u>

The omnibus clause of § 1503 states that "whoever … corruptly … endeavors to influence, obstruct, or impede, the due administration of justice shall" be guilt of a crime. 18 U.S.C. § 1503. To sustain a conviction under the omnibus clause of § 1503, the government must establish, *inter alia*, "that the defendant acted with the wrongful intent or improper purpose to influence [a] judicial or grand jury proceeding, whether or not the defendant is successful in doing so – that is, 'that the defendant corruptly intended to impede the administration of that judicial proceeding.'"[13] *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006) (quoting *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003) (additional citations omitted)). In this context, the Supreme Court has defined "corruptly" as "normally associated with wrongful, immoral, depraved, or evil." *Id.* (quoting *Arthur Anderson LLP v. United States*, 544 U.S. 696, 705 (2005) (quotation marks omitted)).

---

[13] The government must also prove that "(1) there is a pending judicial or grand jury proceeding constituting the administration of justice; and (2) that the defendant knew or had notice of the proceeding." *Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006). Sampson does not dispute that the government established these two elements.

Defendant claims that the government offered insufficient evidence that he acted with the requisite corrupt intent. Def. Mem. at 19-22. Defendant acknowledges that he sought information on cooperating witnesses before the government was obligated to produce its "3500 material." *Id.* at 20. He further concedes that he tried to obtain this information from non-public sources. *Id.* at 21. However, he stresses that the only purpose behind these actions was to uncover impeachment material on government witnesses. *Id.* Pursuing this "basic defense function," he argues, was neither corrupt nor even improper. *Id.* at 21-22 (citing *United States v. Jadue*, 31 F. Supp. 3d 794, 798-99 (E.D. Va. 2014)).

The government presents a different theory concerning Sampson's state of mind. First, as discussed above, the government contends that Sampson's corrupt purpose was to tamper with witnesses.[14] Gov't Opp. at 20. Further, the government maintains that Sampson's efforts to provide Ahmad with confidential information were intended to prevent Ahmad from disclosing the $188,500 loan to the government. *Id.* at 20-21. The government's rationale is that, if Sampson could bolster Ahmad's chances against the government in the Mortgage Fraud Case by providing him confidential information, then Ahmad would be less likely to plead guilty, cooperate with the government, and disclose the loan. *Id.* at 21. Moreover, there was ample evidence presented at trial that Defendant had violated ethical codes of conduct applicable to state senators by virtue of favors he had done for Ahmad before the loan was made and before the Mortgage Fraud Case was filed. Ahmad had a wealth of information about Defendant's misconduct generally, and the jury was entitled to consider all the evidence presented.

Defendant and the government clearly and skillfully presented to the jury these competing theories regarding Sampson's *mens rea*. Both sides' theories are reasonable, but the

---

[14] Additionally, as discussed above, the argument that Sampson demonstrated an intent to tamper with witnesses is different than the argument that he tampered with witnesses or attempted to do so.

question before the Court is not whether the government's inferences are more likely than Defendant's. *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) ("[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence."). Rather, the issue is whether the evidence, viewed in the light most favorable to the government, "is nonexistent or so meager that no reasonable jury could find" that Sampson acted with a corrupt intent. *Guadagna*, 183 F.3d at 130.

Viewed in this light, the evidence demonstrates that Defendant tried to obtain sensitive and confidential law enforcement information to which he was not entitled. By attempting to access this information *before* the government was obligated to produce it, he sought to circumvent the law. *See* 18 U.S.C. § 3500(a) ("In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection *until said witness has testified* on direct examination in the trial of the case.") (emphasis added).

Defendant relies on the fact that, "as part of the trial process, the government produces 3500 material" to conclude that his attempts to access this material prematurely were not improper. Def. Mem. at 20. If the Court were to adopt this logic, it would be impossible to punish the unlawful disclosure of sensitive information, such as the existence of wiretaps or confidential informants, so long as the defendant could show that the government eventually would have produced the information anyway. Common sense dictates that, during certain stages of an investigation or prosecution, sensitive information must be kept secret from the target of the investigation or prosecution for obvious reasons. Accordingly, attempts to thwart that secrecy have long been treated as crimes, regardless of whether the defendant eventually

discovers the information at trial. *See e.g. United States v. Giovanelli* 464 F.3d 346, 350 (2d Cir. 2006) (upholding a § 1503 conviction where the defendant provided sensitive information to the target of an ongoing grand jury investigation). Thus, Defendant's "inevitable discovery" argument is meritless.

Not only did Defendant brazenly disregard the strictures of § 3500, he did so in a manner that was grossly unethical, particularly for a lawyer. To summarize, Sampson (1) asked one of his closest friends to betray the trust and confidence of the United States government, and, as a result, (2) proximately caused his friend to commit and be convicted of a crime, (3) attempted to cause a former FBI agent to do the same, and (4) sought to invade the sanctity of the attorney-client privilege for other defendants. Moreover, he knew he was engaging in wrongdoing, as evidenced by his overwhelming consciousness of guilt demonstrated by the furtiveness of his actions. *See* GX 501T at 6-7 (refusing to discuss Noel over the telephone); Tr. 390:10-16 (insisting to speak with Ahmad outside Ahmad's office because it might contain a recording device); Tr. 413:5-11 (requesting that Ahmad provide Sampson with a different telephone line because Sampson suspected Ahmad's telephone was being recorded); Tr. 472:11-13 (asking Ahmad to remove the battery from his cellular telephone); Tr. 494:18-22 (communicating with Ahmad by writing on a piece of paper instead of speaking).

Certainly a rational, reasonable juror could weigh this evidence and conclude that Sampson acted with a state of mind that was "wrongful," "immoral," or even "depraved." *Arthur Anderson*, 544 U.S. at 705. The inference urged by Defendant is admittedly possible, but the "government's evidence need not exclude every other possible hypothesis." *Eppolito*, 543 F.3d at 45. Considering "all of the evidence, direct and circumstantial," the Court concludes that a rational trier of fact could have found the intent element of the crime satisfied beyond a

reasonable doubt.  *Id.*

   ii.  <u>Sampson Intended to Influence a Judicial</u>
      <u>Proceeding, the Mortgage Fraud Case</u>

   In *United States v. Aguilar*, 515 U.S. 593 (1995), the Supreme Court imposed a "nexus"

requirement on the intent element of § 1503.  *Id.* at 599.  To satisfy the nexus requirement, the

government must demonstrate that the defendant acted "with an intent to influence judicial or

grand jury proceedings; it is not enough that there be an intent to influence some ancillary

proceeding, such as an investigation independent of the court's or grand jury's authority."  *Id.*

(citing *Brown v. United States*, 688 F.2d 596, 598 (9th Cir. 1982)); *see also United States v.*

*Schwartz*, 283 F.3d 76, 109 (2d Cir. 2002) ("The thrust of the Court's opinion in *Aguilar* is that §

1503 requires a specific intent to obstruct a federal judicial or grand jury proceeding.").  Stated

another way, "the [defendant's] endeavor must have the 'natural and probable effect' of

interfering with the due administration of justice."  *Aguilar*, 515 U.S. at 599 (quoting *United*

*States v. Wood*, 6 F.3d 692, 696 (10th Cir. 1993)).  The nexus requirement limits the scope of §

1503's omnibus clause, but is not itself a separate element of § 1503 the government must prove.

*See Quattrone*, 441 F.3d at 170 ("The nexus limitation is best understood as an articulation of the

proof of wrongful intent that will satisfy the *mens rea* requirement of 'corruptly' obstructing or

endeavoring to obstruct.").

   In support of his nexus argument, Sampson recycles the same rationale he employed in

support of his argument that he did not act with a corrupt intent.  Def. Mot. at 22.  He claims that

he was simply attempting to confirm the identities of the government's witnesses to "gather

impeachment material, a perfectly permissible endeavor."  *Id.*  Accordingly, Defendant argues

that no rational jury could have found that the "natural and probable effect" of pursuing this

legitimate goal was to "interfer[e] with the due administration of justice."  *Id.*

Defendant's argument misses the entire point behind *Aguilar's* nexus requirement, which is to ensure that the defendant's intent is directed at "judicial or grand jury proceedings." *Aguilar*, 515 U.S. at 599. The "natural and probable effect" standard was intended to clarify this essential holding, not serve as a substitute for it. *Id.* ("The action taken by the accused must be with an intent to influence judicial or grand jury proceedings.… *In other words*, the endeavor must have the natural and probable effect of interfering with the due administration of justice.") (emphasis added) (citations and internal quotation marks omitted). In *Aguilar*, the defendant lied to FBI agents conducting an investigation that had not been authorized or directed by the grand jury. *Id.* at 597. The Supreme Court reversed the § 1503 conviction because, even though the defendant lied to the FBI, there was no evidence the defendant intended that his false statement be provided to the grand jury. *Id.* at 601. *See also Schwartz*, 283 F.3d at 109 (reversing § 1503 conviction, based on *Aguilar*, because "there was no showing that [the defendant] … knew that the allegedly false statements he made to the federal investigators … would be conveyed to the federal grand jury.").

Here, the nexus requirement does not come into play, because there is no doubt that Defendant intended to influence the Mortgage Fraud Case. Defendant sought certain confidential information about the Mortgage Fraud Case, so he could pass that information to Ahmad, the defendant in the Mortgage Fraud Case. Sampson also wanted to know if he too was a target, and asked Noel if he was mentioned by any cooperator. As discussed above, the evidence would have allowed a rational, reasonable jury to infer that, had he succeeded, Sampson would have given Ahmad an unfair advantage in the Mortgage Fraud Case, prevented Ahmad from pleading guilty in the Mortgage Fraud Case, or even influenced the testimony of witnesses in the Mortgage Fraud Case. To conclude from this that Sampson's actions were not

intended to influence the Mortgage Fraud Case would be absurd.

The Second Circuit's construction of *Aguilar* in *Giovanelli* further confirms this conclusion. The defendant in *Giovanelli* obtained confidential information from grand jury proceedings and passed that information to the targets of the grand jury's investigation. *Giovanelli*, 464 F.3d at 350. Upholding the § 1503 conviction, the court held that the defendant's "attempt to analogize his case to those of *Aguilar* and *Schwartz* – cases in which a defendant lied to a government investigator with no obvious connection to a particular grand jury proceeding – is unconvincing." *Id.* at 351. The only difference between the present case and *Giovanelli* is that Sampson failed where the *Giovanelli* defendant succeeded, but this distinction is irrelevant to the analysis. *See Aguilar*, 515 U.S. at 601 ("Our reading of the [§ 1503] gives the term 'endeavor' a useful function to fulfill: It makes conduct punishable where the defendant acted with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but is foiled in some way."). Accordingly, like *Giovanelli*, *Aguilar* is inapposite to the facts of this case, and the conviction on Count Two must stand.

### III.     Count Seven – False Statement, 18 U.S.C. § 1001

Count Seven charged that Sampson "falsely stated and represented to Federal Bureau of Investigation Special Agents that he did not recall seeing the Check Register Page previously, when in fact, as he then and there well knew and believed, the defendant did recall seeing the Check Register Page previously." S-6 Indictment at ¶ 55. Sampson asks the Court to overturn Count Seven because his statement to Special Agent Hosey was "literally true" pursuant to *Bronston v. United States*, 409 U.S. 352, 362 (1973). Def. Mem. at 25-26. Alternatively, Defendant claims that his statement does not meet the materiality element of 18 U.S.C. § 1001. *Id.* at 26-28.

In *Bronston*, the Supreme Court overturned a perjury conviction where the defendant's answer to a question under oath was "literally true but unresponsive." *Id.* Later, in *United States v. Mandanici*, 729 F.2d 914, 921 (2d Cir. 1984), the Second Circuit held that defendants charged under § 1001 also could assert the *Bronston* literal truth defense. *Id.* ("[A] defendant may not be convicted under § 1001 on the basis of a statement that is, although misleading, literally true."). Sampson claims his statement to Special Agent Hosey, that he did not recall seeing the Check Register Page before, was literally true, because the document Special Agent Hosey showed Defendant was the Photocopy Register Page. Def. Mem. at 25. Because he had never seen the Photocopy Register Page, Sampson claims that his statement that he did not recall seeing that document was literally true. *Id.* at 25-26.

Although literal truth may be a defense to § 1001 prosecutions, the Second Circuit has cautioned that, "when testimony is knowingly false, perjury has been committed," regardless of whether a *Bronston* defense applies. *United States v. Lighte*, 782 F.2d 367, 374 (2d Cir. 1986). A defendant's "statements must be judged according to common sense standards and given their natural meaning in relation to their context." *United States v. Schafrick*, 871 F.2d 300, 303-04 (2d Cir. 1989). The "literal truth or falsity of a defendant's words" cannot be determined if those words are divorced from their proper context. *Id.* at 304 (citing *United States v. Ford*, 603 F.2d 1043, 1049 (2d Cir.1979)). "[E]ven if [a defendant's] statements could be literally true in isolation," a perjury conviction will be sustained if the defendant's statements, taken in context, were "materially untrue." *Id.* (citing *United States v. Bonacorsa*, 528 F.2d 1218, 1221 (2d Cir. 1976), *cert. denied*, 426 U.S. 935 (1976)).

For Sampson's answer to be "literally true," the Court would have to conclude, based on

the entire context of the July 27, 2012 interview, that Special Agent Hosey was asking whether Sampson had ever seen the Photocopy Register Page. *See Schafrick*, 871 F.2d at 304 (holding that literal truth may only be determined in context). Why Special Agent Hosey would have asked such a perfectly useless question is beyond the Court, and Sampson does not even attempt to explain why he believed that that was the question posed by Special Agent Hosey. *Of course* Special Agent Hosey was not asking if Defendant literally had ever seen the actual photocopy then being displayed; Special Agent Hosey was asking if Sampson had ever seen the image depicted therein. *Id.* ("[S]tatements must be judged according to common sense standards and given their natural meaning in relation to their context."). The only way Defendant's statement may be deemed "literally true" is if the Court viewed the statement in isolation, which is precisely what the precedent of this Circuit prohibits. *Id.*

Despite the obvious import of Special Agent Hosey's statement, Sampson nevertheless maintains that, "the burden was on the FBI" to ask whether Sampson "had seen[] a document similar to that which he was shown." Def. Mem. at 26 (quoting *Bronston*, 409 U.S. at 360 ("The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry.")). In other words, according to Defendant, Special Agent Hosey should have spelled out what was already perfectly clear from the context. The error with this argument is that the obligation to "pin the witness down" does not apply unless the declarant first provides an unresponsive answer. *Id.* ("If an answer is responsive to the question, then there is no notice to the examiner and no basis for applying *Bronston*."). Defendant's answer that he did not recall seeing the Check Register Page was directly responsive to Special Agent Hosey's question, so the *Bronston* defense is not available to Sampson here.

     B.     <u>Sampson's False Statement Did Influence, and Was</u>
                 <u>Capable of Influencing, the FBI's Investigation of the Loan</u>

Sampson claims that, even if his statement was false, it was not material within the meaning of 18 U.S.C. § 1001, because the FBI asked Sampson about the Photocopy Register Page. Def. Mem. at 27. He asserts that the truth or falsity of his answer would not have provided the FBI with any useful information about the loan itself. *Id.* Thus, he maintains that the FBI's investigation of the loan did not depend on whether or not Sampson had previously seen this document.[15] *Id.* He also claims that his false answer was immaterial because the FBI already knew that Sampson had seen the Duplicate Register Page. *Id.* at 28.

18 U.S.C. § 1001 provides that "whoever … knowingly and willfully … makes a materially false, fictitious, or fraudulent statement or representation" shall be guilty of a crime. A statement is material within the meaning of § 1001 if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decision making body to which it was addressed." *United States v. Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012) (internal citations and quotation marks omitted). "It has never been the test of materiality that the misrepresentation or concealment would more likely than not have produced an erroneous decision." *Kungys v. United States*, 485 U.S. 759, 771 (1988); *see also United States v. Santiago*, 2014 WL 4827883, at *5 (S.D.N.Y. Sept. 26, 2014) ("[T]he test of materiality is objective, not subjective; that is, a statement is material if it is capable of influencing a decision by a decision-making body even if the body did not in fact rely on the statement." (citing *Kungys*, 485 U.S. at 771)). A court may find materiality "even if [t]he particular decisionmaker … thought that the statement was false at the time it was made." *Santiago*, 2014 WL 4827883, at *5 (citing *Brogan v. United States*, 522 U.S. 398, 402 (1998)).

---

[15] Sampson is correct that his answer to whether he had ever seen the Photocopy Register Page would have served no purpose. Ironically, this underscores the Court's point from the previous section that Special Agent Hosey clearly was not asking such a pointless question.

Here, Sampson's false statement had both a "natural tendency to influence" *and* was "capable of influencing" a "decision" of the FBI, the "decision" in this case being the further investigation of the loan and any possible illegal conduct by Defendant. *See Id.* ("Here, the decision making body is NCIS … and the decision that the decision maker had to make was: who shot Carpeso?"). The question of whether Defendant had previously seen the Check Register Page goes to his overall knowledge of the Check Register Page and the loan it memorialized. True, the FBI already knew that Sampson was aware of the Check Register Page because of the recorded February 22, 2012 restaurant meeting with Ahmad. However, Sampson's awareness of the Check Register Page was only a small portion of Defendant's overall knowledge of the loan, including what he did with the proceeds, and why he was so determined to conceal the loan's existence. Sampson's initial false statement demonstrated that he had no intention of revealing this critical information during the July 27, 2012 interview. As such, his falsehood "tend[ed] to influence," and indeed actually did influence, the FBI's investigation of these matters.

Furthermore, Sampson's false statement was material because, even if it did not actually influence the FBI's investigation of the loan, it was "capable" of influencing the investigation. The fact that Special Agent Hosey knew Sampson was lying, while perhaps being evidence of guilt, is irrelevant. *See Id.* ("[A] statement is material if it is capable of influencing a decision by a decision-making body even if the body did not in fact rely on the statement."). As noted above, the Check Register Page evidenced a loan that affected a number of critical issues in this case. Accordingly, Sampson's statement, that he had not previously seen this important document, was capable of influencing the FBI's investigation of the loan, and was therefore material. Defendant's motion to vacate the guilty verdict as to Count Seven is denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Rule 29 motion is denied in its entirety.

SO ORDERED

Dated: Brooklyn, New York
     February 26, 2016

                                        /s/
                                  Dora L. Irizarry
                         United States District Judge