1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,          ) Criminal
                                   ) No. 13-269 (DLI)
                    Government,    )
                                   ) SENTENCING
        vs.                        )
                                   ) Brooklyn, New York
JOHN SAMPSON,                      ) Date:  January 18, 2017
                                   ) Time:  10:00 a.m.
                    Defendant.     )
_____

TRANSCRIPT OF SENTENCING
HELD BEFORE
THE HONORABLE CHIEF JUDGE DORA L. IRIZARRY
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Government:        Alexander A. Solomon, AUSA
                           Paul Tuchmann, AUSA
                           Maria Seifan, AUSA
                           US Attorney's Office
                           Eastern District of New York
                           271 Cadman Plaza East, 4th Floor
                           Brooklyn, New York  11201
                           718-254-6074

For the Defendant:         Nick Akerman, Esq.
                           Joshua Colangelo-Bryan, Esq.
                           Dorsey & Whitney LLP
                           51 West 52nd Street
                           New York, New York  10019
                           212-415-9217

Also Present:              Cheryl Fiorillo, US Probation Office

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
_____

Court Reporter:            Annette M. Montalvo, CSR, RDR, CRR
                           Official Court Reporter
                           United States Courthouse, Room N375
                           225 Cadman Plaza East
                           Brooklyn, New York  11201
                           718-804-2711

1          (Open court; 10:20 a.m.)

2          THE COURTROOM DEPUTY:  Criminal cause for

3   sentencing.  Docket No. 13-CR-269.  *United States v. John*

4   *Sampson*.

5          Please state your appearances.

6          MR. TUCHMANN:  Paul Tuchmann for the United States.

7   Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. SOLOMON:  Good morning, Your Honor.  Alex

10  Solomon.

11         MS. SEIFAN:  Good morning, Your Honor.  Marisa

12  Seifan for the United States.

13         THE COURT:  Good morning.

14         THE PROBATION OFFICER:  Good morning, Judge.  Cheryl

15  Fiorillo, US Probation.

16         THE COURT:  Good morning.

17         MR. TUCHMANN:  With us at counsel table, Kenneth

18  Hosey of the FBI.

19         MR. HOSEY:  Good morning.

20         THE COURT:  Good morning.

21         MR. AKERMAN:  Your Honor, Nick Akerman for

22  Mr. Sampson.

23         THE COURT:  Good morning.

24         MR. COLANGELO-BRYAN:  Good morning, Judge.  Joshua

25  Colangelo, Dorsey & Whitney, also for Mr. Sampson.

1          THE COURT:  Good morning.

2          And good morning, Mr. Sampson.

3          Everyone, please have a seat.

4          I am going to ask everyone please to remain seated

5   so that we can all hear each other better, and we have a lot

6   of folks in the audience, a lot of observers.  I am sure

7   family members and friends of Mr. Sampson as well, good

8   morning to all of you.  And they will not be able to hear

9   anything, I guarantee, unless we speak into the microphones.

10  So please try to keep your voices up and speak into the

11  microphones as much as -- while we are having this proceeding.

12          Before we actually get to the substance of

13  sentencing, I just want to review with you, Mr. Sampson, and

14  also for the sake of our members of the audience, I want to

15  review with you how it is that we are going to proceed this

16  morning.

17          The first thing that I am going to do is I am going

18  to place on the record everything that I have received and

19  considered with respect to sentencing.  That's for two reasons

20  that are interrelated.  First, so that all of you, all of the

21  parties, are assured that I, in fact, have received everything

22  I should have received and considered with respect to

23  sentencing, and, also, sort of interrelated with that, so that

24  all of you, all of the parties, are assured that I indeed --

25  that all of you have received everything that I have received

4

so that we are all working with the same information.

Next, to the extent that there are still outstanding objections to the pre-sentence report, and given the nature of the arguments that are contained in the sentencing memoranda, I am assuming that the parties have adhered to at least some of the original objections that were made to the pre-sentence report, both on the part of the government and on the part of the defense, so I will resolve those objections. And then as I am required to do, I will make a finding as to what the sentencing guideline range is in this case. Indeed, some of the objections relate to the calculation of the guideline range. I, of course, have to make that final determination. And we start with that even though the guidelines are advisory, and even though I have to consider other things than just the guideline range, and that would include any sentencing policies, of course, that are embodied in the statutes of conviction, the guidelines themselves, any departures, either upwardly or downwardly, that might be appropriate under all the circumstances here, and any 3553(a) factors that are relevant in this particular case.

Because I do have to consider all of these other things besides just the advisory guideline range, I will give the parties an opportunity to address the Court, keeping in mind that I have read all of your sentencing memoranda, and some of the points have been argued repeatedly. So I am not

1  exactly too inclined to hear the same argument, the same

2  arguments again.  To the extent that any of my rulings on the

3  objections might change your argument, I am certainly happy to

4  hear that.

5          And then, Mr. Sampson, I know that you wrote a

6  letter to the Court, and it is included in the sentencing

7  memorandum that was provided by your counsel, among other

8  documents.  Nonetheless, you still have a right to make a

9  statement to the Court before I impose sentence.  And if you

10 wish to make a statement, of course, I will be happy to give

11 you the opportunity to make such a statement.  So it is not

12 until we have actually gone through all of that that I will

13 impose sentence.

14         Mr. Sampson, do you understand that process?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  Thank you.

17         All right.  So what I have received is quite a lot.

18 We start with the pre-sentence report and sentencing

19 recommendation that was disclosed by probation on March 18 of

20 2016.  There are defendant's objections to the pre-sentence

21 report, dated April 1 of 2016.  There were certain exhibits

22 that were attached, which include cases that were cited as

23 well as certain transcript excerpts from the trial of this

24 case.

25         There's the government's objections to the

1    pre-sentence report, also dated April 1 of 2016.  There was a

2    letter on behalf of -- a reference letter that was submitted

3    on behalf of Mr. Sampson from a Mr. William S. Wilkins, a

4    director of economic development, dated March 30 of 2016,

5    which was docketed, and I believe that also was included along

6    with the exhibits of letters that were attached to the

7    defendant's sentencing memorandum.

8          MR. COLANGELO-BRYAN:  Slightly revised version, just

9    to clarify.

10         THE COURT:  It was substantially the same, and it

11   was on the same letterhead, as I recall.  May have been a

12   little bit longer than what was included in the sentencing

13   memorandum.

14         There is the government's response to the

15   defendant's objections by letter dated April 13 of 2016.

16   There is defendant's letter of April 13, and exhibits in

17   response to the government's objections to the pre-sentence

18   report.

19         There was another reference letter which was

20   submitted directly to the court, dated April 10 of 2016, and I

21   had a hard time making out the letter, but I think that letter

22   may have also been incorporated in the sentencing memoranda by

23   Diane Sult.

24         MR. COLANGELO-BRYAN:  Yes, Your Honor.

25         THE COURT:  S-u-l-t.

1          There is the addendum to the pre-sentence report

2   submitted by probation, dated April 26 of 2016.  There is a

3   second addendum to the pre-sentence report, which corrects an

4   error that was made in the sentence -- the revised sentence

5   guideline range, or the revised calculation of the guideline

6   range, based on the objections made by the parties.

7          I note that even though the guideline range is

8   different in the second addendum to the pre-sentence report

9   dated May 5 of 2016, Ms. Fiorillo, there was no revised

10   sentence recommendation.  I don't know if that -- I didn't

11   receive a revised sentence recommendation.  I don't know if

12   one had been prepared, or whether the government was adhering

13   to its original sentence recommendation.

14          THE PROBATION OFFICER:  Your Honor, I apologize.

15   There was a revised sentencing memorandum.  I have a copy.  I

16   will bring it up.

17          THE COURT:  Did everyone get a copy of the revised

18   sentencing recommendation?

19          MR. COLANGELO-BRYAN:  The parties received it --

20          MR. AKERMAN:  Yes.  We received it.

21          MR. COLANGELO-BRYAN:  -- via e-mail.

22          THE COURT:  This is why I do this.  It happens

23   sometimes.  It is not anybody's fault, especially when there's

24   a lot of documents.

25          (Said document tendered to the Court.)

8

1        THE COURT:  Thank you, Ms. Fiorillo.

2        THE PROBATION OFFICER:  You're welcome, Judge.

3        THE COURT:  There was a letter of reference, again,

4  sent directly to the court from a Mr. Rock Hermon Hackshaw.  I

5  believe it was undated, but the court received it on May 9.

6  Sorry.  It is dated April 30 of 2016.

7        There's defendant's sentencing memorandum, which

8  contains a number of exhibits.  As I referenced earlier, there

9  are quite a few letters from a variety of persons, including a

10 letter from the defendant, a letter from family members,

11 letters from community persons and ministers, and various

12 assortment of constituents and nonconstituents.

13       There is the defendant's declaration concerning

14 attempts to make a partial deposit of surplus of funds in

15 connection with one of the referee appointments that he had

16 received, that Mr. Sampson had received.

17       There's some transcript excerpts that are also

18 attached.  And as I mentioned, Mr. Sampson's letter.

19       There's the government sentencing memorandum May 12

20 of 2016.  That also has exhibits relating to some items that

21 were referred to in the body.  A campaign brochure, and a

22 letter from the state board, division of election, law

23 enforcement state board of elections, in connection with that

24 campaign brochure.

25       The Court received another letter of reference

1  directly from a Margaret Johnson, and that letter was dated

2  May 19 of 2016.

3       There is a reply sentencing memorandum by defendant,

4  which was filed on June 2 of 2016.  That also has exhibits,

5  specifically a sentencing transcript on the sentencing in the

6  Southern District of New York of Senator Dean Skelos.

7       There is a pretrial supervision status report,

8  indicating -- dated September 15 of 2016, indicating that the

9  defendant had been compliant with his release conditions,

10 reported as required, otherwise complied with all the

11 conditions, had been cooperative, exhibited a pleasant

12 demeanor when interfacing with the officer and during all his

13 contact and telephone conversations.

14      There is a letter from the government with various

15 exhibits, dated December 5, 2016, relating to an appearance by

16 the defendant in the family court, as an attorney after he had

17 been suspended from the practice of law on March 14.  The

18 appearance was on March 22 of 2016 in the family court.  The

19 suspension was on March 14 of 2016 by the First Department.

20      By e-mail sent to my deputy on January 11 of 2017,

21 the parties may not have this, but it is just a confirmation

22 that probation -- that pretrial services had no additional

23 information to submit in connection with the status report.

24      And there is a letter from the defendant responding

25 to the government's December 5 letter.  The defendant's letter

1 is dated December 23, 2016, discussing the family court

2 appearance.

3          That's everything that I have received as relevant

4 to sentencing.  Is that everything that I should have from the

5 government?

6          MR. TUCHMANN:  Yes, Your Honor.

7          THE COURT:  From probation?

8          THE PROBATION OFFICER:  Yes, Judge.

9          THE COURT:  And how about from defense?

10          MR. COLANGELO-BRYAN:  Your Honor, I would just note

11 that we submitted a letter on July 5, 2016, regarding the

12 Supreme Court's decision in *McDonnell*.  Part of the letter

13 pointed out that there were some sentencing issues that could

14 relate to that decision.

15          THE COURT:  And I gave the parties leeway to address

16 that --

17          MR. COLANGELO-BRYAN:  Right.

18          THE COURT:  -- but you didn't submit anything

19 addressing that.

20          MR. COLANGELO-BRYAN:  I'm sorry, we understood the

21 order to mean that we should address those issues at

22 sentencing here today.

23          THE COURT:  If you did not address -- if you want to

24 raise an argument that you did not address in your sentencing

25 memoranda, then you can do that orally.

1          MR. AKERMAN:  Yes, Your Honor.

2          MR. COLANGELO-BRYAN:  Yes.

3          THE COURT:  That was the *McDonnell* decision, and I

4    think that if I recall --

5          MR. COLANGELO-BRYAN:  There was an opposition from

6    the government.

7          THE COURT:  There was --

8          MR. COLANGELO-BRYAN:  Partial opposition.

9          THE COURT:  There was an opposition from the

10   government, and I entered an electronic order on September 19

11   of 2016, basically, as the court stated there, the Court found

12   it unnecessary to issue any opinions stating the reasons why

13   it agreed with the government and its opposition letter with

14   respect to the defendant's request.  The government's

15   opposition letter was dated July 8 of 2016, because the

16   defendant was neither charged with nor convicted of any

17   bribery offense.

18         MR. COLANGELO-BRYAN:  Your Honor, if we can also

19   note that the revised sentencing recommendation, which was

20   just handed to the Court, does, in fact, contain a different

21   recommendation as to the sentence.  The revised

22   recommendation --

23         THE COURT:  So to the extent there is a revised

24   recommendation, which represents I believe the lower end of

25   the new guideline calculation.

1          MR. COLANGELO-BRYAN:  Correct.  Recommendation was

2  41 --

3          THE COURT:  Which is consistent with the

4  recommendation that -- the first recommendation that probation

5  made, which was also on the low end of the guideline range, as

6  initially calculated by probation.

7          MR. COLANGELO-BRYAN:  Right.  Just a four month

8  difference between the two.

9          THE COURT:  Correct.  So, obviously -- well, not

10  obviously, but to the extent that the parties want to address

11  probation's recommendation, certainly you can address that.

12          But do I have everything that the defense thinks I

13  should have?

14          MR. COLANGELO-BRYAN:  Yes, Your Honor.

15          THE COURT:  Okay.  So, Mr. Sampson --

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  -- did you have an opportunity to review

18  all these documents that I just listed?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  Did you review them with your attorneys?

21          THE DEFENDANT:  Yes, I did.

22          THE COURT:  Are you familiar with the objections

23  that were raised on your behalf by your attorneys?

24          THE DEFENDANT:  Yes, I am, Your Honor.

25          THE COURT:  And other than the objections that were

1    raised by your attorneys to the pre-sentence report, is there

2    anything else that you think still needs correcting, or is in

3    error, anything about family history or anything like that?

4              THE DEFENDANT:  I think everything is good,

5    Your Honor.

6              THE COURT:  Okay.  All right.  Thank you.

7              So now going to the objections to the pre-sentence

8    report, there were -- I am not going to address those

9    objections where essentially the parties agreed, and probation

10   entered corrections accordingly.

11             So we'll start with the first addendum to the

12   pre-sentence report, and then address the second addendum.

13             As the government noted, just for sake of clarity,

14   while there was a superseding indictment that was used for

15   ease of use, if you will, during the trial, which was a sixth

16   superseding indictment, the charges that the defendant

17   actually was convicted of actually were related to the fifth

18   superseding indictment.  So all changes were made by probation

19   to reflect that change throughout and to make that consistent.

20             In connection with paragraph 15, I think that

21   probation has addressed that appropriately.  With respect to

22   paragraph 18, probation has made a grammatical change.  With

23   respect to paragraph 18, and in connection with Hansraj,

24   H-a-n-s-r-a-j, Hansraj's affidavit that was notarized by the

25   defendant, the defendant requests that the statement that

1    Sampson learned that Ahmad had submitted documents to the

2    agency be deleted, the Court agrees that there was enough

3    circumstantial evidence that the defendant knew or at the very

4    least was reckless in not knowing that the statements that

5    were contained in the affidavit were false.  And while there

6    was a difference in the testimony between Hansraj and Ahmad as

7    to whether or not Hansraj signed the affidavit in Sampson's

8    presence, those facts are included in the amendment.  So the

9    Court agrees that there should not be any redaction of that

10   sentence.

11          With respect to paragraph 20, defense counsel

12   objected to language indicating that the defendant attempted

13   to tamper with witnesses.  The government provided -- the

14   government responded and opposed.  Defense counsel -- excuse

15   me.  Probation deferred to the Court as to whether or not the

16   language in paragraph 20 should be revised.  And the Court

17   finds that probation should revise the language to incorporate

18   the language that is in the government's letter dated April

19   13, in relation to paragraph 20.

20          And the same with respect to paragraphs 26 and 29,

21   defense counsel objects to language that Sampson attempted to

22   arrange for Ahmad's coconspirators to be represented by

23   compromised counsel, who would betray attorney-client

24   confidences in order to convey essential information to him.

25   I think probation and the government seem to be using the term

1    "compromised counsel" because, in essence, the defendant was

2    the one who obtained these attorneys for Ahmad's codefendants,

3    with the intention of being able to consult with them about

4    their cases and report back to Ahmad, in which case these

5    counsel were not independent counsel.  And, in fact, with

6    respect to one of them, the defendant spoke with Ahmad about

7    how Ahmad could pay for that attorney, which was clearly a

8    conflict and inappropriate.  The language should be amended to

9    reflect the language that's contained on page 3 of the

10   government's April 13 opposition letter.

11           With respect to paragraph 34, it should be amended

12   to insert the language that's proposed by defense counsel in

13   counsel's opposition -- in counsel's objection.  And the

14   government consents to that.

15           With respect to paragraphs 36 and 37, defense

16   counsel, as probation put it, clarifies that it was Ahmad

17   acting on behalf of the government, who first suggested the

18   idea of not producing the document to the government, a fact

19   that likely was of significance in Sampson's being acquitted

20   of all counts involving this episode.  That's speculation and

21   is not appropriate to include.  The government's description

22   in its opposition, which is on pages -- on the bottom of page

23   3 and the top of page 4 of their April 13 letter, is more

24   accurate, and the pre-sentence report should be amended to

25   include that language.  It is consistent with the evidence

1   adduced at the trial.

2          With respect to paragraph 88, this relates to the

3   defendant's attempts on two occasions to provide the -- it

4   should clarify the Brooklyn Supreme Court or the Kings County

5   Supreme Court as a partial payment in relation to the 8th

6   Avenue property foreclosure matter.  The government had

7   countered that the defendant should provide a declaration, the

8   defense had offered a declaration; however, no declaration was

9   offered prior to the addenda being prepared and was only

10  offered up in connection with the sentencing memoranda.  So

11  the declaration that's part of the sentencing memoranda can be

12  used to supplement that paragraph because without that

13  declaration, it is just an unsworn statement.

14         Okay.  The offense level computation, both parties

15  disagree with probation's calculation.  The government thinks

16  it is too low, the defense thinks it is too high, not

17  surprisingly.  The Court agrees with the analysis of probation

18  with respect to Count 4, which is the obstruction of justice

19  count.  The Court agrees with probation that in connection

20  with the application of Guideline 2X3.1, as it is set forth in

21  the addendum, would apply, and that means that, ultimately, we

22  look at the base offense level for the underlying offense,

23  which is mortgage fraud, which provides not only the base

24  offense level, plus any applicable specific offense

25  characteristics that were known or reasonably should have been

1    known by the defendant.

2         The Court agrees with both probation and the

3    government that the defendant was aware that Ahmad was

4    involved in the mortgage fraud.  Ahmad was clearly very

5    successful.  He treated the defendant and other individuals to

6    various cruises and trips and vacations, and various other

7    kinds of entertainment.  The defendant went to Ahmad to ask

8    him for a loan of almost $200,000.  Clearly, he knew that

9    Ahmad would be capable of providing that amount of cash on the

10   spot, right away.

11        Moreover, the defendant, having himself been

12   involved as a referee in foreclosure actions, and having

13   himself engaged in real estate transactions as an attorney,

14   was very much aware of the money that could be made from these

15   transactions, and defendant's argument that defendant couldn't

16   know that Ahmad was using straw buyers, just really flies in

17   the face of common sense based on the evidence that was

18   adduced at trial and the inferences that could be drawn from

19   it, because a lot of the discussion that's cited by the

20   defense to counter it was, in essence, the story that Sampson

21   was concocting with Ahmad as a cover to counter the indictment

22   for the mortgage fraud.  And what facts Ahmad did give him

23   clearly shows that straw buyers were being used and not one,

24   but multiple.

25        So the 16 point enhancement for the $3 million loss

1   for the underlying mortgage fraud applies and gets added to

2   the base offense level under 2B1.1, which is 7.  So that's

3   a -- you wind up with an aggregate base offense level of 23.

4          The Court agrees with defense counsel and probation

5   that the role enhancements that the government seeks to add to

6   that calculation is not appropriate because those are not

7   specific characteristics of the fraud itself.  They are under

8   a different guideline, and so they are not applicable.

9          The defense objects to the -- the only other

10   objection with respect to any enhancement with respect to the

11   obstruction of justice count is the application of the abuse

12   of a public trust in a manner that significantly facilitated

13   the commission or concealment of the offense.  And the defense

14   relies primarily on the defendant's status as a senator.  But

15   he wasn't just a senator, he was an attorney.  And a lot of

16   what he did actually involved his status as an attorney.  And

17   it seems to me that the status as an attorney is what's really

18   at the core of the obstruction of justice.

19          As I said, as a backdrop, he was a referee appointed

20   by Brooklyn Supreme Court justices to oversee foreclosure

21   sales of various properties in Kings County, and he had an

22   obligation pursuant to those appointment orders to remit any

23   surpluses after all of the creditors had been paid, after all

24   the taxes and liens had been paid, to remit any surpluses to

25   the county clerk of Kings County.  And that wasn't done.

1    Instead, he embezzled from the escrow funds containing these
2    surpluses, and it was his attempt to cover up this
3    embezzlement by obtaining the loan from Ahmad that sort of set
4    the wheels in motion in connection with his obstruction of
5    justice in connection with the mortgage fraud case against
6    Ahmad.

7              He fully understood, having done criminal cases
8    himself, how criminal cases developed, the incentive for
9    people to become cooperators, what attorneys could do and what
10   attorneys couldn't do, when witnesses would be identified,
11   when they wouldn't be identified.  He used his skill and
12   knowledge and relationships developed as an attorney in
13   criminal cases to hire the attorneys for Ahmad's codefendants
14   so that he could find out directly from them what was
15   happening in those cases so as to prevent them from
16   cooperating, and, also, to try to discourage Ahmad from
17   cooperating, the fear being that if Ahmad cooperated, Ahmad
18   would give up the information about the loan and ultimately
19   lead to the disclosure of the embezzlement.  That's why I
20   started with the embezzlement.

21             He also used his life long relationship and
22   friendship with Noel, an administrative employee of the US
23   Attorney's office of this district, to induce him to get
24   confidential information, which he knew Noel would have access
25   to.  And he knew the importance of that access by virtue of

1  being an attorney and understanding that this is information

2  that he would not be able to obtain until such time as the

3  government would turn over 3500 material, and even then he

4  might not know the full name of all cooperators unless they

5  were going to testify at trial.  And it was also based on his

6  knowledge gleaned as an attorney about US Attorney's offices

7  operations.

8         The same was true with the recruitment of the

9  private investigator, the retired FBI agent.  He used his

10 knowledge as an attorney as to how that would operate and what

11 that investigator could do or not do in terms of getting

12 information.  And it seems a bit disingenuous to believe that

13 his role as a senator had no role to play with any of this.

14 Because Ahmad certainly was inspired to give the loan, not

15 just out of friendship, but also as a result of favors he

16 thought that he could get.  And, in part, their relationship

17 was based on favors that Sampson would do for him.  And as I

18 said previously, Ahmad also would treat him to trips and so

19 on.

20        To think that a person might not necessarily be

21 inclined to be more forthcoming because a person has a

22 position of high authority I think is to ignore human behavior

23 and defies common sense.  So the abuse of trust certainly

24 applies with respect to the obstruction of justice

25 calculation.

1           Then, of course, the rest of it was corrected in the

2     second addendum in terms of the multiple counts with respect

3     to the false statement counts and so on, and there was no

4     increase in an offense level.

5           The government's -- the Court joins probation and

6     defense counsel in rejecting the government's arguments that

7     Counts 7 and 9 should not be grouped for all the reasons that

8     were set forth in those papers.  So the Court finds that the

9     guideline range as reflected in the second addendum to the

10    pre-sentence report is what applies here.  And listen

11    carefully because I want to make sure that I state it

12    correctly on the record.

13          It is based on a total offense level of 21.

14    Defendant has a criminal history category of I, and that

15    provides a sentence guideline range of 37 to 46 months.  Given

16    the Court's rulings, have I stated that range correctly?

17          MR. TUCHMANN:  Yes, Your Honor.

18          THE COURT:  Ms. Fiorillo, is that correct?

19          THE PROBATION OFFICER:  Yes, Your Honor.

20          THE COURT:  And who's taking the lead?

21    Mr. Colangelo-Bryan?

22          MR. COLANGELO-BRYAN:  Yes, Your Honor.  Pleased to

23    say that.

24          THE COURT:  All right.  There was also the

25    incorporation of other criminal conduct that the government

1   sought to include.  Another way of stating it would be other

2   bad acts, if you will, which probation has incorporated by way

3   of the addendum, and the Court agrees that it should be

4   incorporated.  Of note, the Court can consider pretty much any

5   kind of information in connection with sentencing, and the

6   case law is clear, it is black letter.  Moreover, the Court

7   can consider acquitted conduct.  The Court can consider

8   dismissed conduct, and very often in pre-sentence reports we

9   see information about perhaps situations where defendants have

10  been arrested, but no disposition is known, for a variety of

11  reasons, records get destroyed, perhaps it is too old, perhaps

12  the person was very young, they are sealed, they are not

13  accessible, or the charges are dismissed, sometimes for

14  reasons known, sometimes for reasons not known.

15          But, importantly, the Court can consider acquitted

16  conduct, the Court can consider other similar types of conduct

17  before other agencies.  And the fact that it was not

18  necessarily conduct that evidence was presented about during

19  the course of the trial does not mean that it cannot be

20  considered at the time of sentencing.

21          So the defendant's objections in that regard are

22  overruled.

23          MR. COLANGELO-BRYAN:  Your Honor, can I note one

24  thing in that regard?

25          THE COURT:  Yes.

1          MR. COLANGELO-BRYAN:  That the government in its

2    May 12, 2016 letter to the Court, on page 19, footnote 11,

3    indicates that it is no longer attempting to rely on one of

4    the episodes that had been raised with probation.  So,

5    accordingly, we would submit that that episode should not be

6    considered even under the Court's ruling.

7          THE COURT:  Okay.  That's -- I agree.  That's on

8    page 19 of the government's May 12 submission, and that

9    relates to the incident involving campaign finances.  So that

10   should be omitted.

11         And I would think, Ms. Fiorillo, given the breadth

12   of the revisions that the Court is directing to be done, that

13   we get a revised -- one coherent revised pre-sentence report

14   because I think otherwise it is a little disjointed.

15         THE PROBATION OFFICER:  Yes, Your Honor.

16         THE COURT:  Okay.  Thank you.

17         Thank you, Mr. Colangelo-Bryan.

18         I think that that takes care of all the objections

19   that were raised.  You may not agree with me, but I think I

20   have addressed them, in any event.  Am I correct about that?

21         MR. TUCHMANN:  Yes, Your Honor.

22         THE COURT:  From the defense?

23         MR. COLANGELO-BRYAN:  Yes, Your Honor.

24         THE COURT:  Okay.  All right.  So we are at that

25   point where, as I said, I will give the parties an opportunity

24

1    to address the Court in connection with the factors that the

2    court should consider with respect to sentencing.

3           I will start with --

4           MR. AKERMAN:  Your Honor, before we go there, could

5    we just take a brief break for the facility, and also just to

6    reorganize based on Your Honor's rulings?

7           THE COURT:  Okay.  We will take ten minutes.

8           MR. AKERMAN:  That would be terrific.  Thank you.

9           THE COURT:  Sure.

10           (Recess taken from 11:10 a.m. to 11:21 a.m.)

11           THE COURT:  Welcome back.  We are resuming again.

12    *United States v. John Sampson*, 13-CR-269, same appearances as

13    earlier.

14           And we were at the point where I was going to turn

15    the floor over to counsel to address any factors they think I

16    should take into consideration with respect to sentencing.  I

17    will start with the government, and then I will give the

18    defense on opportunity to respond.

19           Who wishes to be heard for the government?

20           MR. SOLOMON:  Your Honor, with the Court's

21    indulgence, I have a couple of opening comments to address

22    some arguments raised in the defense papers, and then

23    Mr. Tuchmann will address the 3553 factors.

24           THE COURT:  Okay.

25           MR. SOLOMON:  So, Your Honor, one of the issues

1  raised in the defense sentencing memorandum was the

2  defendant's public service to New York state.  And I think it

3  is important to note that we are not here today to discuss the

4  defendant's acts as a public servant.  He sought out privilege

5  that the public conferred on him.  He wanted the power to

6  serve the public.  He wanted the power to do good.  But he

7  decided to use that power for his own benefit, and that's why

8  we are here today.

9          And it doesn't matter that the defendant served the

10 public some of the time when he was in office.  He should have

11 been serving the public all of the time.  He shouldn't get

12 special credit for sentencing purposes, just because he was

13 doing his job.  We are here because he was primarily concerned

14 about serving himself.  Now, the John Sampson that was

15 depicted through witness testimony, and also through taped

16 conversations involving the defendant, is of a person

17 diametrically different from the person portrayed in the

18 defense sentencing submission.

19         Your Honor, you heard the defendant on tapes.  For a

20 person who sat as the chair of the ethics committee in New

21 York state, his behavior was shocking.  He was manipulative,

22 vulgar, selfish, and greedy.  In fact, he talked about using

23 his office to make money.  That is the person who deserves

24 punishment, and that's the person we are discussing today.

25         Now, speaking for the government, we were struck by

1   the defendant's statement to the Court, his written apology,

2   and I think we can all agree that we would be in an entirely

3   different position today if he had that apologetic attitude

4   when we first started our investigation.  Instead of taking

5   responsibility for his errors, as he is now, he dragged down

6   his long-time friend Sam Noel, and he was completely ready to

7   take down other employees from our office with him, and anyone

8   else who got in his way.  So instead of admitting to his

9   misconduct, he repeatedly obstructed justice and lied to FBI

10  agents when asked about his misconduct.

11          The final point I would like to address in the

12  defense submission, before I turn it over to Mr. Tuchmann, is

13  I think it is absolutely preposterous to suggest that the

14  government has conceded that the Dean Skelos case is a more

15  serious case than this case.  The team at this table

16  represents the government in the prosecution of John Sampson.

17  Your Honor, not Judge Wood, is the judge presiding over this

18  case.

19          The Skelos team in its sentencing submission sought

20  a sentence of more than 150 months.  And I think if you look

21  carefully at the government's submission in that case, they in

22  no way suggested that the Dean Skelos case is more serious

23  than this case.  They remarked, and I think we would all

24  agree, that John Sampson was charged with different kinds of

25  crimes than Dean Skelos was.  The defendant in this case has

1   been convicted on obstruction of justice and false statement

2   counts, not with bribery counts.

3           MR. TUCHMANN:  Your Honor, I just want to turn,

4   then, to 3553(a) factors, particularly history and

5   characteristics of the defendant, and focus on the bad conduct

6   of all kinds that you heard and saw that the defendant engaged

7   in through the evidence at the trial.  I will start with that.

8   And, you know, I won't belabor the point, Your Honor has

9   mentioned some of these things during your discussion of the

10  guidelines.

11          But just to start, the obstruction count of

12  conviction related to a multi-faceted scheme to get

13  information, nonpublic information, about cooperating

14  witnesses with the intent that they could be tampered with.

15  And perhaps the saddest aspect of this case is the defendant's

16  abuse of his long-standing and close relationship with a good

17  and decent man, Sam Noel, an employee of this office.  He took

18  advantage of that relationship, knowing that it was the wrong

19  thing to do, knowing, as he said on the tape to Ahmad, that it

20  was illegal, and putting his friend in jeopardy.  Jeopardy of

21  being convicted of a crime, as he was, and of losing the

22  livelihood that he had here in this office, as he did.

23          He even played on that trust when he first broached

24  the subject with Noel by saying that he, himself, was in

25  trouble.  It was that -- he, himself, Sampson, was in trouble.

1  It was that statement. Once Sam Noel heard that, there was no

2  way that such a close friend would resist the defendant's

3  request to do something wrong and something illegal, and,

4  sadly, that's exactly what happened. And not only the

5  defendant, but Sam Noel has had to suffer the consequences.

6  As Your Honor said, the defendant also got

7  compromised counsel or tried to represent Noel in order to

8  learn such nonpublic information and manipulate the legal

9  process, again, knowing that it was wrong. As you saw on one

10 of the tapes, when Ahmad first discussed paying one of those

11 coconspirator's lawyers, the defendant said, "I did not hear

12 you say that. You didn't say that." Because the defendant

13 knew it was wrong. But within a few seconds, he was telling

14 Ahmad, "Okay, pay in cash so there's no money trail." This is

15 a defendant who knew exactly what was right and wrong, but did

16 what was wrong anyway.

17 Again, even when he was told by the investigator

18 Warren Flagg, that crossing certain lines would be witness

19 tampering and wrong and you shouldn't do it, he later did the

20 same thing by saying to Flagg things like -- saying to Ahmad

21 about Flagg, "I have got to have somebody to do -- to do the

22 dirty work." By saying to Ahmad when Ahmad was going to tell

23 his legitimate attorney, Steve, about what they planned to do,

24 he says, the defendant says to Ahmad, "Steve don't have to

25 know everything that he does," meaning Flagg.

1          He said, the defendant said, "You always got to have

2    somebody who always plays, plays between the lines, but you

3    also have to have somebody who knows the gray area."  The

4    defendant knew exactly what was right and what was wrong, and

5    he wanted to have someone do the thing that was wrong, not

6    just what was right.

7          If we look at the conduct at Vetro restaurant on

8    February 22, 2012, you have the defendant committing a crime

9    on tape.  And we understand this is acquitted conduct, but it

10   is, the government's submits, clearly conduct which was proved

11   by a preponderance of the evidence for the Court to find.  And

12   Ahmad said to him, "Obviously, I've got to turn this over,"

13   meaning this check register page, which was proof of the

14   nearly $200,000 loan he had given the defendant that the

15   defendant desperately for some many reasons wanted to hide.

16   Ahmad gave the defendant the choice, "What should I do?"  Very

17   quickly the defendant said, in classic John Sampson double

18   talk, "I don't want you to lie, just tell them you don't have

19   it."

20         Well, that would obviously be a lie.  It would be

21   wrong, the defendant knew it.  He did it anyway.  And, again,

22   he tried to cover up his tracks after repeatedly telling Ahmad

23   during this meeting not to give the document to the

24   government, to lie to the government about the $188,500, to

25   preposterously say that it was for legal fees.  Later on he

1    knows -- he believes, correctly, that his phone is being

2    tapped.  He calls up Ahmad and says, "Hey.  That document,

3    keep a copy of it."  When Ahmad says to him, "You took my only

4    copy, how could I make a copy of it?"  The defendant doesn't

5    acknowledge it.  He knows what he's doing is wrong, and he's

6    trying to cover his tracks.

7            Over the course of the trial, we saw, it is

8    essentially undisputed that the defendant abused his position

9    as an attorney, as an appointee of the Supreme Court, by

10   embezzling hundreds of thousands of dollars from escrow

11   accounts, including to pay for his campaign for Kings County

12   District Attorney.  Shocking.

13           We saw him repeatedly lie on financial disclosure

14   forms that he was required under penalty of law to fill out

15   and submit, omitting the nearly $200,000 that he got from

16   Ahmad.

17           We saw that he lied to the State Liquor Authority

18   through the submission of a liquor license application that

19   did not include him because he wanted to keep that secret from

20   the public.  I'll talk a little bit more about why.

21           We saw obstructing state investigations of Ahmad's

22   businesses, allowing -- contributing to the knowing submission

23   of false affidavits as part of that.  We saw him doing

24   political favors for Ahmad.  After he got the nearly $200,000

25   loan, which was never repaid, never documented, no interest,

1  we saw him introduce bills that would benefit Ahmad and his

2  business.  Again, without disclosing the money he had received

3  from Ahmad.  We saw him call up and meet with the head of the

4  entire New York state banking department.  Think about that.

5  To pressure, to pressure the banking department to alter and

6  ease up as part of its investigation of Ahmad's business, to

7  give him more time to pay.

8          And while it was not introduced at trial, we see the

9  other things that were submitted by the government, which the

10 Court has accepted.  Frankly, the testimony under oath from

11 the state inspector general about the Aqueduct bidding

12 process, it is appalling.  When cornered, saying that the New

13 York State Senate had no confidential information, so it was

14 okay for him to simply provide bidding information to one of

15 the parties so that that party could have an advantage, again,

16 astounding.

17         And even after he was convicted in this case, again,

18 before he's even sentenced, he appears in court, family court,

19 while under temporary suspension by the New York state bar.

20 No, it is all there in the appellate division opinion.  It

21 just shows an incredible lack of the awareness that he should

22 have about what he's done, what it means, and how to do right

23 rather than wrong when you know exactly what right is and what

24 wrong is.

25         The last thing I am going to talk about is the

1  conduct involving the liquor store and the use of an employee,

2  a senate employee.  As we know, the defendant had an ownership

3  interest in his liquor store.  He didn't tell anyone about it,

4  no one on his staff.  Tried to keep it hidden, wanted to keep

5  it hidden, and he actually tried to use his staff to benefit

6  that liquor store that he owned.  Classic conflict of

7  interest, a violation of the public officer's law.  He says to

8  his staffer, and this is in Transcript Exhibit 605-T, line 23.

9  He says, "His partner needs some help, he has to pay a

10  liquor -- he has to pay the sales tax people.  So he just

11  wants to see if you can negotiate the amount down a little

12  bit."

13          He's telling his staffer to contact the state

14  department of taxation, to use his own office, to try and

15  reduce the tax liability of a business that he has an interest

16  in.  That is wrong.  He knows it is wrong, and he does it

17  anyway.

18          Finally, you know, there was a -- again, we have

19  seen, as Mr. Solomon addressed, there was a lot of discussion

20  about the defendant's good work as a legislator, and we are

21  not in a position to talk about specific bills, specific

22  constituent service.  I would say that there are a lot of ways

23  to engage in public service.  As a judge, as a prosecutor, as

24  defense counsel, helping people exercise their Sixth Amendment

25  rights in criminal cases.  So many other ways.  And running

1  for elected office is also an important way that we can serve

2  the public, people can serve the public.  And it is a risky

3  endeavor in the sense that you could lose.  There's no shame

4  in running for office and not being successful.  What is

5  shameful is when you take your position, and you have the

6  attitude that it is something that you can use to help

7  yourself in a way that's more important than serving the

8  public.

9          So I want to read from Exhibit 615-C, transcript of

10  a call that was played.  This was from January 3, 2012.  And

11  this is during a period when the defendant was the minority

12  leader of the state Senate, his party was in the minority.

13  And he wanted, quite naturally, to have his party become the

14  majority party again.  So he was talking to someone on the

15  phone, and what he said was, "Yo" -- this is line 33 of that

16  call.  "Yo, once I get this majority back and do what I got to

17  do, setting myself up and getting the fuck out, make some

18  money, girl, let's try to make some money and live nice."

19          That's what the defendant thought of his public

20  service.  And as Mr. Solomon said, that's the defendant who

21  should be sentenced today.  Thank you.

22          THE COURT:  Thank you.

23          And who's going to address on behalf of the

24  defendant?

25          MR. AKERMAN:  I will, Your Honor.

1      THE COURT:  Thank you.

2      MR. AKERMAN:  First of all, let me run through the

3  various sentencing factors here.  One of them is the

4  collateral consequences to Mr. Sampson from all of this.

5  There is no question here that these collateral consequences

6  have been severe.  He no longer serves as a state senator.

7  He's been disbarred from the practice of law.  He has lost his

8  entire livelihood, and he's also suffered a tremendous

9  reputational damage.  With respect to the factor of general

10  deterrence and disparity, certainly even a short term of

11  imprisonment in addition to what has occurred here would

12  afford adequate deterrence.

13      The government has argued that a sentence at the

14  absolutely highest end of range is necessary to deter public

15  officials, given recent corruption scandals.  Mr. Sampson,

16  however, was not convicted of corruption.  However, since the

17  government raises this issue, it is worth examining one of the

18  most recent corruption cases, which did involved Dean Skelos,

19  former New York state majority leader.  Skelos was convicted

20  on eight corruption counts.

21      Now, it wasn't Judge Kimba Wood that was the one, as

22  Mr. Solomon said, was the one that said it was the worst case

23  of corruption, it was actually the government in the Skelos

24  case that said it was the most serious public corruption crime

25  committed in New York state in recent memory that was in its

1    sentencing memo to Judge Wood.  They mentioned, first, the

2    Sampson case about the obstruction of justice lying to federal

3    agents.  They then mentioned the --

4            THE COURT:  The crimes of conviction were different

5    in those two cases.

6            MR. AKERMAN:  They were different, Your Honor.  But,

7    essentially, the government took the position that the Skelos

8    case was much worse.  It was worse than the Sampson case.  And

9    Judge Wood agreed with that.

10           THE COURT:  And that's a US Attorney's office in

11   another district, speaking to a judge in another district, and

12   none of that has anything other than perhaps some

13   persuasiveness.  It is not binding on this Court.

14           MR. AKERMAN:  I agree, but --

15           THE COURT:  And it is apples and oranges.  The

16   crimes of conviction were different.

17           MR. AKERMAN:  They were different, and I think the

18   main point here is.

19           THE COURT:  And perhaps in some ways more brazen in

20   the way that it was conducted by Mr. Skelos.  Maybe a little

21   more cheeky, to a certain degree.

22           MR. AKERMAN:  I guess just two points --

23           THE COURT:  But the guidelines were different, the

24   ranges were different.  And so, you know, if you want to talk

25   sentencing disparities, when the guidelines -- when the

1  3553(a) factors were passed in Title 18 of the United States

2  code in that statute, initially, the idea was that you look at

3  national sentencing disparities of similarly situated

4  defendants.  So you have to look at similar crimes, similar

5  guideline ranges, similar backgrounds, and so on.

6         Ultimately, especially in the last maybe five or six

7  years, the law at least in this circuit has evolved somewhat

8  from that to allow the district courts to look at sentencing

9  disparities as they relate to codefendants recognizing that

10  sometimes within a case where there are multiple defendants,

11  especially where there are a lot of multiple defendants, you

12  need to take into account relative roles, and who was

13  similarly situated to whom, in order to figure out whether

14  similar sentences should be meted out to some or all of the

15  defendants.  But we are not, in my view, talking about two

16  defendants who are necessarily similarly situated, other than

17  they are both senators.  The crimes of conviction are

18  different, the guidelines are different, what they did is

19  different.

20         MR. AKERMAN:  But one factor that Judge Wood did

21  find was that the most common sentence for convicted

22  legislators in New York is approximately 70 percent of the low

23  end of the guideline range.  That's certainly a factor that

24  should be considered by this Court.

25         There were similar concerns in a similar case, just

1   to give another example in terms of avoiding any disparity,

2   the *US v. Joseph Dwyer* case.  The defendant was a former

3   police officer, turned private investigator.  He paid a New

4   York City police sergeant to get confidential witness

5   information from an FBI database, eleven federal prosecutions.

6   The defendant obtained the names and locations of witnesses to

7   violent crimes before the time that such information would be

8   disclosed as 3500 material and used that information to

9   interview at least two witnesses to a homicide.

10          The defendant in that case pled guilty, was

11   sentenced to make a payment, was on probation.  The officer

12   who gave information to Dwyer was also given probation.  Here,

13   Mr. Sampson sought information --

14          THE COURT:  And they pled guilty.

15          MR. AKERMAN:  Correct.

16          Mr. Sampson here, though, sought information about

17   witnesses in one matter rather than eleven, and the underlying

18   crime here did not involve violence like those in Dwyer, and

19   Mr. Sampson did not, as it was in the Dwyer case, attempt to

20   contact or contact any of the witnesses.

21          With respect to specific deterrence, the shame and

22   humiliation that --

23          THE COURT:  But he sought to interfere with what is

24   probably one of the most sacred rights that we have under our

25   great constitution of this country, which is the right to

1    counsel, of those codefendants.

2            MR. AKERMAN:  Clearly, the facts were different, but

3    in terms of confidential information, and the fact that that

4    case involved crimes of violence is a whole different

5    situation.  And we simply point it out in terms of the overall

6    disparity, Your Honor, for consideration.

7            With respect to specific deterrence, obviously, the

8    shame and humiliation Mr. Sampson feels will stay with him for

9    life.  The US Sentencing Commission study shows that

10   defendants over 50, Mr. Sampson is 51, with a category I

11   criminal history category have only 6.2 rate of recidivism.

12           THE COURT:  But, again, you have to look at these

13   studies on recidivism in -- you have to really look at how

14   that data is collected and what that data means.  There's a

15   difference between a defendant who commits a crime -- it is

16   one time, let's say, age 50, commits a crime once.  What we

17   have is an ongoing pattern of activity in his 40s.  The time

18   in which the Sentencing Commission says that people are not

19   likely to commit offenses.  The likelihood of them committing

20   repeated offenses is lower.

21           MR. AKERMAN:  I am only pointing that out as one

22   factor here, Your Honor, as far as what the Sentencing

23   Commission has said.

24           Again, just to briefly respond to the nature and

25   circumstances of the offense here, again, Mr. Sampson never

1 attempted to approach any potential witnesses in the mortgage

2 fraud case, even though he and Ahmad had figured out who those

3 witnesses were without confidential information.

4      With respect to the Vetro restaurant that was

5 mentioned by the government, the government says that Ahmad

6 was the one who told Mr. Sampson that he shouldn't turn it

7 over -- or that he should turn it over, and it was Ahmad who

8 first suggested to Mr. Sampson not disclosing it, which is why

9 the jury acquitted Mr. Sampson on that count, because of the

10 entrapment defense.

11      With respect to the other alleged criminal conduct

12 that we have here, let me just address the opinion in the

13 *McDonnell* case very briefly.  There is no evidence that the

14 payment from Ahmad affected the assistance Mr. Sampson

15 provided to Ahmad.  Ahmad testified repeatedly at trial that

16 Mr. Sampson always helped him, including prior to when the

17 loan was made.  There was no evidence that Mr. Sampson even

18 hinted that he would cease helping Ahmad if Ahmad did not

19 provide the loan.

20      There are a whole series of actions, I think some of

21 which the government has referred to, and just to very

22 briefly --

23      THE COURT:  These are the same arguments that you

24 made at least three or four times in your sentencing

25 memorandum, and that doesn't include the number of times that

1   they were repeated in reply and in the objection letters.  So,

2   again, if there's something different from what was said in

3   the papers, I am happy to hear it.

4          MR. AKERMAN:  Certainly, as to all of these

5   different acts that the government claimed at trial were

6   bribery, there was nobody was -- pressure was not put on

7   anybody, there was no evidence of a quid pro quo.  The closest

8   it came as to any of these acts was the idea that there would

9   be legislation introduced on behalf of Mr. Ahmad.  The bottom

10  line is, Mr. Ahmad never asked for that legislation, he was

11  surprised that -- Mr. Sampson's, one of his aides came up with

12  that legislation.  The fact that it was not asked for means

13  that there couldn't have been any possible quid pro quo, and,

14  again, that act is certainly not actionable as a criminal act

15  under *McDonnell*.

16         THE COURT:  *McDonnell* is inapposite here.  I said

17  that already.  I have already ruled on that.  That's the law

18  of the case.

19         MR. AKERMAN:  With respect to the government raising

20  Mr. Sampson's unauthorized practice of law, we have submitted

21  a declaration from Mr. Sampson explaining what happened there.

22  This was a situation where somebody had been a prior client,

23  asked him to help.  The problem was, of course, he didn't tell

24  the court that he had been convicted.

25         THE COURT:  There were several problems there, and

41

1   apparently the First Department had a really serious problem

2   because they summarily then barred him from the practice of

3   law altogether because he was required under their initial

4   ruling in March that he had to advise all of his clients in

5   writing. In writing. Not pick up the phone and not say,

6   "Hey, by the way, I have been suspended from the practice of

7   law," but in writing inform all of his clients that he had

8   been suspended from the practice of law. To start with. He

9   only told that client over the phone that he had been

10   suspended, so he violated that rule.

11         He didn't tell any of his adversaries nor did he

12   advise the family court, as he was required to do by the First

13   Department's ruling, that he had been suspended from the

14   practice of law. Nor did he represent when he said, "Well, I

15   will be withdrawing today." I read the transcript, and I read

16   the decision from the First Department that was attached to

17   the government's letter. He at no time said "I am withdrawing

18   because I have been suspended from the practice of law, and I

19   cannot represent this person." In fact, that should have been

20   the first thing out of his mouth --

21         MR. AKERMAN: We are not disputing that.

22         THE COURT: -- in that court. And so the excuses

23   that he raises in the declaration and that are raised in the

24   letter attached to it, that he didn't get paid, is irrelevant,

25   and, frankly, supports the government's position that the

1  defendant thinks that he is above the law.

2          MR. AKERMAN:  It certainly doesn't support their

3  position that he was making any money off of this because he

4  certainly didn't --

5          THE COURT:  It doesn't matter whether he was making

6  any money off of it or not.  He was practicing law without a

7  license, and in direct contravention to an order of the court.

8  I don't know how much more contemptuous of the law you can get

9  than that, especially from somebody who has been a lawyer and

10  who has been one of the highest ranking members of the Senate,

11  and who, in fact, was chair of the Senate ethics committee.

12  Lawyers are held to a higher standard.  And I don't see how he

13  can excuse his way around that conduct and knowing, knowing

14  that he had a sentence pending in this case.  Knowing he had a

15  sentence pending in this case.  He's not a stranger to

16  criminal law.  He's not a stranger to criminal practice.  He's

17  actually quite an intelligent person, by all accounts.  His

18  academic record shows it.

19          MR. AKERMAN:  May I proceed, Your Honor?

20          THE COURT:  Yes.

21          MR. AKERMAN:  Yes.  The other factor that

22  Mr. Solomon discussed was Mr. Sampson's performance and public

23  service in his capacity as state senator and asking the Court

24  to ignore that basically for sentencing purposes.  There is

25  really, there's no case in this circuit that would certainly

1    support that whole idea. Moreover, in *US v. Serafini*, which

2    the government cites to argue that Mr. Sampson should receive

3    no credit for his good works, the Court affirmed a downward

4    departure from state legislature based on community and

5    charitable activities that went beyond the norm, in

6    particular, helping people through his own time and money.

7           And we certainly would submit based on all the facts

8    that we present to this Court, that Mr. Sampson's 18 years of

9    representing economically disadvantaged communities have

10    generated a huge body of good works, including good works that

11    go beyond the norm, and so have his actions, independent,

12    completely independent of his role as a state senator.

13           I think all of his various legislative achievements

14    are pretty well outlined in our sentencing memo. We have

15    provided all of those to Your Honor. But I think that all of

16    these things show that Mr. Sampson was a legislator who took

17    his job seriously, that he did do a number of things that were

18    extremely important, a lot of these are mentioned in the

19    letters that we've provided to the Court. And I think that

20    one of the things I just would like to emphasize is that

21    Mr. Sampson's work and his good works went far beyond that

22    normally performed for constituents and as his role as state

23    senator.

24           He assisted people from anywhere in New York state,

25    not just those in the district. I know the government itself

44

argued at trial that it was outside the norm, and even
suspicious for an elected official to help people outside his
district.  But that is exactly what Mr. Sampson did.  His
chief of staff, Michelle Edwin, wrote that constituents were
not limited to Senate District 19.  Anyone who is hurting, had
a problem, lived in the district, used to live in the
district, or related to him because of his committee
assignments, called the office and received extensive and
absolute help.

        Ms. Edwin writes that when she reminded Mr. Sampson
that some people seeking help were not formally constituents,
Mr. Sampson responded that they were from New York state, and
they were people, so they deserved our help.

        Delroy Wright wrote that he received the greatest
amount of assistance for community events he organized for
Mr. Sampson, even though he was not formally a constituent of
Mr. Sampson.  He also writes that "people would approach me
for advice on many issues.  Very often I would refer these
people to John, and they would come back to thank me for the
referral."

        Another individual I would really like to emphasize
is someone who did not live in his district and whose name I
won't use here due to the sensitivity of the subject matter,
writes how her daughter, "J," was missing a left kidney and a
substantial part of her colon at birth, among other anomalies.

45

Perhaps miraculously J survived, but by the time she was 6, she had become deaf.  The mother sought assistance from various doctors, the New York state department of health and elected officials to arrange for medical treatment that would improve J's quality of life, but to no avail.

When J was 11, her mother brought her to Mr. Sampson.  She writes that after she told Mr. Sampson about J's various conditions, Mr. Sampson said, quote, I am going to help you with your daughter, closed quote.  Through Mr. Sampson's efforts, physicians took an interest in J's case, and within 18 months, she had received multiple surgeries.  J spent five months hospitalized at Boston Children's Hospital, and Mr. Sampson helped raise money to pay fees associated with that stay, and also found a charity that helped the family make rent payments.  The mother describes how Mr. Sampson developed a relationship with her and J, becoming like a godfather to this little girl, who is now 18, and as her mother describes, has a personality that would fill a room.

In our memo, we also described the help he gave to Blanche Peltonbusch, an elderly woman who had various problems, and helped her get action from the city.

And I think most significantly, I think that the information that we provided about Mr. Sampson's actions with respect to Hurricane Sandy are particularly telling about the

1   type of person that Mr. Sampson is.  Danny Foote, a

2   corrections officer, writes that during Hurricane Sandy, he

3   and Mr. Sampson were, quote, waist deep in water assisting

4   residents in the neighborhood, and that once the water began

5   to recede, they went house to house checking on the neighbors.

6          Merlene Griffith, a senior citizen describes in a

7   handwritten letter to Your Honor how during Sandy, she was

8   alone, no light, no stove, in other words, nothing to eat.

9   Her doorbell rang, and she opened the door to find

10  Mr. Sampson.  He was carrying food, a flashlight, and other

11  items.  She writes that Mr. Sampson returned on a daily basis

12  to check in with her because she lived alone.

13         THE COURT:  I read all of these letters.  Every

14  single one of them.

15         MR. AKERMAN:  I'd also just like to emphasize that

16  Mr. Sampson has also continued to help people despite his

17  legal problems.  And after he stopped serving as a senator, as

18  several letters we submitted describe, he has continued to

19  help out people in his community and has gone well beyond and

20  above what you would expect from somebody in this

21  circumstance.

22         I also want to address what the government said

23  about Mr. Sampson, if he were somehow in the majority position

24  he would be making money.  What I think that statement said

25  was that he would be getting out, which means getting out of

1   the government and then making money, which is nothing,

2   nothing improper with respect to that.  I just want to note

3   that for the record, Your Honor.

4          With respect to the conclusion here, the guideline

5   range, as I understand it, is 37 to 46 months.  The probation

6   has recommended 37 months, and it underscored -- well, I think

7   it underscores how unreasonable the government's original

8   request is, and it should -- the Court should look at the

9   starting point from probation, which it has already ruled it

10  will.

11         Mr. Sampson requests that the Court impose a

12  sentence of 366 days, or a sentence of 18 months, half of

13  which would be served in home detention.  He also believes

14  that an appropriate sentence here would include a substantial

15  community service component, talking advantage of things that

16  he does best.  My Time Inc., which deals with special needs

17  children, helps them secure appropriate resources, it is

18  located in Canarsie.  It is run by Lucina Clarke.  And they

19  would be more than willing to have Mr. Sampson be part of that

20  and make that as part of his sentence.

21         Your Honor, I think that's pretty much what I have.

22  All of this has been detailed quite extensively, as Your Honor

23  has noted, in the papers that we submitted to the Court.

24         THE COURT:  Thank you.

25         So, Mr. Sampson, we are at that point where if you

1   would like to make a statement, as I said earlier, I am happy

2   to give you the opportunity to do that.  And if you wish to do

3   so, you can do so now.  We just need to make sure, Counsel,

4   that he's got a microphone so we can hear him.  Thank you.

5          THE DEFENDANT:  Thank you very much, Your Honor.

6          I am going to do something that my lawyer told me

7   not to do, you know, to follow the script of what was prepared

8   for me.  But I feel this situation calls for me just talking

9   from my heart and the way I feel.

10          You know, for five years, I have been living a

11  nightmare.  You know, during that period of time, I have seen

12  my daughter graduate from high school, I buried my father, and

13  now my daughter is graduating from Columbia in a couple of

14  months.

15          And to hear how I have been portrayed in the media,

16  here in court, sometimes I ask myself, is that really me.  You

17  know, I always thought of myself as someone who looked out for

18  the disadvantaged, people who had no voice.  And I believe,

19  you know, I was continued -- I was re-elected because my

20  constituents knew that.  And even during the period of time

21  where I faced all these allegations back in 2014, I was

22  re-elected again.  However, I realize that, you know, no

23  matter how many positive things you can do in life, you

24  always -- it can be overshadowed by one incident or a couple

25  of incidents.  It can overshadow everything that you did in

1   life.

2          And I know that a number of years ago I violated my

3   obligation as a referee and failed to return those funds, and

4   as a result of that, I made bad decisions.  And I understand

5   that these actions have caused suffering to my family, to my

6   constituents, and to, you know, my friend, my man Sam Noel,

7   who is the godfather of my child, my eldest daughter, who's

8   graduating from Columbia.

9          And, you know, that tears at my -- to hear things

10  that are said here today, that tears at my soul every single

11  day because when we grew up, Your Honor, there was nine of us.

12  And we grew up, you know, some might call it the hood, tough

13  neighborhoods, and we all made it out of there.  But one thing

14  that we understood, we were always responsible for one

15  another.  And we always looked out for one another.

16         And what bothers me most of all is I violated that.

17  You know, that's a code that we had amongst ourselves that we

18  would never put one another in harm's way.  We would all be

19  there to protect them.  And for me to do that to my friend

20  Sam, that tears at me every single day.  Every single day,

21  Your Honor.

22         You know, and I apologized to him.  You know, and we

23  are not supposed to have any sort of communications, and I

24  have seen him at events with friends, and, you know, I have to

25  walk away because I can't speak to him.  And that tears at me,

1 and I know it tears at him from the conversations that we have

2 had with our friends.

3      You know, but the bottom line here is, Your Honor,

4 my parents raised me better than this. And they didn't

5 sacrifice everything so I could be in this predicament. One

6 thing my parents always taught me, you know, through faith and

7 education, will always provide a way for you to be successful

8 and succeed in life.

9      So, Your Honor, I apologize for my actions, but most

10 of all, I apologize for not respecting others. Because if I

11 take into consideration others and not myself, maybe I

12 wouldn't be in this predicament that I am in today. You know,

13 and saying that, Your Honor, you know, I accept that there are

14 consequences for my actions. And all the hard work, and I

15 worked very hard, extremely hard to get where I was at. You

16 know, because growing up, you know, I wasn't -- my parents

17 really didn't think I would amount to anything much because I

18 had issues when I was a young man, but I worked extremely hard

19 to get where I am at. And to see that I lost all of that, it

20 is extremely difficult.

21      But I understand that, you know, I have to, you

22 know, ask for forgiveness for those who I have harmed. My

23 family, my constituents, and my man Sam, and understand that,

24 you know, this chapter is closed. And I hope I am given

25 another opportunity to rewrite the next chapter, taking into

1    consideration everything that I did, things that I shouldn't

2    have done, and really exercising better judgment, because

3    nobody can understand the suffering that I have experienced

4    for these last few months.

5           Thank you.

6           THE COURT:  Thank you.

7           When we started this hearing two hours ago, I laid

8    out the procedures that we would follow.  And I do that

9    because even though, Mr. Sampson, you have a law degree, even

10   though you practiced law, even though you have an

11   understanding more or less, you have experienced counsel, I am

12   sure they explained what the process would be, I always want

13   to make sure that the person who sits in your seat has a

14   complete understanding of just how complicated federal

15   sentencing is and all that goes into it.  And it is important

16   as well for the public that's here observing today, that they

17   understand how complicated it is, and it is the hardest

18   decision that any judge, federal or state, has to make, which

19   is to sentence an individual.  And I think in some ways,

20   having been a state court judge, I think in some ways federal

21   judges, while it is harder in some ways, in a way it is better

22   because I think we have more information on which we can rely

23   to make the most important decision that we ever have to make.

24          Money is money.  It is fungible.  You can make it

25   back again.  But when you lose liberty, it is gone.  It is

1   gone.  And so the lawyers who are here understand that I take

2   this seriously, and they understand that that's why I asked

3   for them to put the amount of work that they have put into it.

4   Both sides have done an extraordinary job in a complicated

5   case to give the Court and to give probation the most and the

6   best information possible, and for that, I thank both sets of

7   lawyers.

8          As I said in the beginning, there is a lot that I

9   have to take into consideration.  We start with the

10  guidelines, it is important, and that's why we devote quite a

11  bit of time on it.  By the same token, those guidelines are

12  now advisory.  So it is just the starting point.  They are not

13  binding on the Court.  The Court has to consider whether or

14  not there are departures appropriate within that guideline

15  system.  I have considered them.

16         Oh, I did want to note one thing, and I apologize.

17  The pre-sentence report and the guidelines calculations were

18  done based on the 2015 guidelines manual.  We are now using

19  the 2016 guidelines manual.  That's the manual that is in

20  effect today.  And I did check it very carefully line by line

21  to make sure that all of the relevant provisions have not

22  changed because there were some amendments to the new

23  guidelines, and in connection with this case, there were no

24  changes.  I don't know whether the parties had also taken a

25  look to make sure that the manuals did not pose, in

1   particular, any ex post facto application.

2           MR. TUCHMANN:  We hadn't looked specifically, but we

3   are not aware of anything that has changed since that would

4   affect this calculation.

5           THE COURT:  Ms. Fiorillo?

6           THE PROBATION OFFICER:  There were no changes,

7   Your Honor.

8           THE COURT:  And Mr. Akerman?

9           MR. AKERMAN:  I would have to join the government in

10  the same position, but I will go with Ms. Fiorillo, if she

11  says there are none --

12          THE COURT:  I did review it myself because I always

13  feel I have the obligation to make sure that I have considered

14  absolutely everything.  So forgive me, I meant to mention that

15  earlier.

16          And, again, so these are all things that are

17  important and the Court has to consider.  And I mentioned that

18  because sometimes there are changes to policies and so on that

19  are relevant for sentencing.  That's not the case here, in my

20  view, taking a look at everything that I have before me.

21          But as I said, that's just the starting point.  The

22  Court considers, as I said earlier, policies reflected in the

23  guidelines, in the statutes of conviction.  And the Court also

24  has to consider what we've mentioned in this hearing, the

25  3553(a) factors that are basically codified in the statute, in

1  Title 18 of the United States Code, Section 3553(a).  And,

2  very simply, these are the goals that Congress has determined

3  should be accomplished any time a federal judge imposes

4  sentence, and it is those goals that are listed as factors.

5           That statute starts with what's called the parsimony

6  clause that says that whatever sentence the Court imposes

7  should not be greater than necessary to achieve those goals of

8  sentencing.  And so what are those goals?  Well, not

9  everything applies in every case.  So, for example, this is

10  not a case where restitution applies, for example.  But the

11  Court has considered the nature and circumstances of the

12  offenses here, Mr. Sampson's history and characteristics.

13  There's been a lot of discussion both in the papers and here

14  today about that.

15           The sentence should reflect the seriousness of the

16  offenses of conviction, promote respect for the law, provide

17  just punishment for the offense, afford adequate deterrence to

18  criminal conduct generally and society as a whole, and protect

19  the public from further crimes of the defendant, specifically.

20           It should also provide the defendant with any needed

21  educational or vocational training, I don't think that's an

22  issue here, medical care, I don't think that's an issue here

23  as well, or other correctional treatment in the most effective

24  manner, which I and I think some of my colleagues sometimes

25  look to rehabilitative potential, if you will.

Case 1:13-cr-00069-DLI Document 2381 Filed 04/26/17 Page 55 of 71 PageID #: 54078

1          There's been some discussion here today about

2     potential sentencing disparities, and that's, of course,

3     another 3553(a) factor.

4          There is no doubt in my mind, having gotten to know

5     this case very well, there was extensive motion practice.  The

6     Court was forced to dismiss the embezzlement counts because

7     they were time barred.  I know the government has filed a

8     notice of appeal on the issue.  I did what I thought was the

9     right thing to do under the circumstances here.  But, again,

10    that is something that, as I said earlier, at sentencing, the

11    proof -- the Court can consider dismissed or acquitted conduct

12    and other information.  I presided over the trial, I heard the

13    witnesses, I heard the arguments, and then there was post

14    trial motion practice, and, of course, extensive briefing for

15    today.

16         These offenses of conviction are serious because

17    they go to the heart or the integrity of our criminal justice

18    system.  It goes to our process and the integrity of process.

19    And those are based on constitutional principles that we hold

20    dear in this country.  Soldiers go out there every day and

21    risk their lives to protect these principles.  You have a

22    right to counsel, you have a right to due process, not to be

23    deprived of property or liberty without due process.  Equal

24    protection under the laws.  We just dedicate -- observed the

25    holiday of Martin Luther King, who lost his life protecting

1  these rights and urging others to do what they can to protect

2  these rights.  And we are living in a time when our criminal

3  justice system, our court system as a whole, even in civil

4  cases, is under attack.

5         And when before the Court is someone who raised his

6  hand and took an oath to protect and defend and obey the laws

7  and constitution of this state and of this country, and you

8  take actions that go towards attacking the integrity of the

9  process, I don't know of any more serious offense.

10  Thankfully, no actual steps were taken to tamper with

11  witnesses in Ahmad's mortgage fraud case.  It is serious

12  enough, in my view, that you took steps to effect their right

13  to independent unfettered counsel.  Such an important right.

14         You did tamper, to a certain degree, with Ahmad, who

15  was a potential witness, or with evidence, depending on how

16  you look at it, that he was instructed by subpoena to provide

17  to the government, the check register page.

18         And the arguments by the defense that it was Ahmad

19  who made the suggestion that you not give it to the government

20  are so disingenuous.  We sat here and looked at the video of

21  that encounter in the Vetro restaurant.  And when you saw that

22  page, the first words out of your mouth were, "Oh.  This isn't

23  good.  For me, I mean."  Maybe not exactly in those words, but

24  pretty close.

25         And for what seemed to be a really long time, you

1    sat there and you looked at it, and you looked at it, and you

2    looked at it, and you looked at it.  And you made sure that

3    Ahmad couldn't give it to the government by taking it, knowing

4    it was his only copy.  So, in essence, you did tell him the

5    truth.  "I am not going to tell you not to lie, just tell them

6    you don't have it," because you made sure he didn't have it.

7    Pictures's worth a thousand words.  All you have to do is see

8    that video.

9           And, then, when confronted by the FBI agents and

10   asked whether you had seen that very same document that you

11   had sat there and stared at and stared at and stared at, and

12   then took, and deny recalling seeing it ever, and make

13   additional false statements about the liquor store, and when

14   they tell you, "Oh, you know, it is a federal offense to lie

15   to a federal law enforcement officer," and your response was,

16   "Not everything I said was a lie."

17          Well, what does that mean?  That means some of it

18   was a lie.  You had to know, as an attorney, that it would be

19   a violation of the law to lie to a federal officer.  And at

20   the root of all of this, the root of all of this is some idea

21   that you picked up along the way that you had a right to

22   dispense with your ethical obligations, to dispense with your

23   duties as an officer of the court, to violate the court orders

24   appointing you as a referee of the Kings County Supreme Court,

25   a big trust, to proceed over foreclosures.  Lots of money in

1  foreclosures.  $440,000 over four properties.  That's a lot of

2  money that you put in your pocket.

3        And as I sat there reading the letters of people who

4  said, "Yeah, well, you know, he paid for, you know, this

5  person's medical expenses, and he paid for this person to

6  repair his home, or he provided this or provided that," I had

7  to wonder whether that money didn't come from some of these

8  embezzled funds.

9        You just dispensed with your obligations altogether

10  to the Supreme Court of this state, to the people of this

11  state.  Because those surplus funds were supposed to go to a

12  court, a court strapped for money.  As a legislator, you know

13  that the budget for the state supreme -- for the state courts

14  is always a serious issue.  They always work at a deficit.

15  And that money, I am sure, could have gone to some good use.

16  But you wanted to cover -- once you got some inkling that that

17  had to be covered up, then everything was put in motion.

18        It is disturbing that you actually, again, abused

19  your position as an attorney.  You represented yourself.  You

20  held yourself out to be an attorney for Ahmad when the state

21  banking people and the state -- department of state people

22  came to take his records away.  You showed up right away.  You

23  tried to stop it.  You tried to use your influence.  It didn't

24  stop them.  Now you had to do triage.  And then comes the

25  Hansraj affidavit.

1          You told Ahmad, "Don't be the fall guy.  Let some

2   one of your other flunkies be the fall guy."  That's what that

3   affidavit was about, was somebody else being the fall guy

4   because you needed Ahmad.  You used an expired notary license,

5   you didn't follow any of the procedures that you were supposed

6   to do, again, violating your ethical obligations.

7          It is disturbing that we have a pattern here, as set

8   forth in the other acts that the government has discussed at

9   length, and I don't think that I need to review it.  It is in

10  the papers.  It is in the pre-sentence report.  The failure to

11  disclose on the financial disclosure report that you had all

12  along, that you owned an interest in the liquor store, you had

13  an obligation to disclose.  And that is under penalty of

14  perjury.  The fact that you were not actually prosecuted for

15  it, I say shame on the state agencies for not being more

16  diligent about it.  I think there was also some other state

17  proceeding, if I am recalling from the trial or from the

18  papers, the motion papers, a state proceeding where you went

19  to represent Ahmad, even though as a member of the Senate you

20  couldn't go there and represent him.

21         Where it has suited you in your own purpose, you

22  have sidestepped your obligations, you have sidestepped the

23  law, and you have used it to your benefit.  And if it hurts

24  somebody else, well, so be it.  You knew somewhere in the back

25  of your mind if you got caught, there would be consequences,

1  and the consequences would be you would lose your Senate

2  position, you would lose your license.  Yes, there would be

3  humiliation and shame because you are a public figure, a

4  famous public figure.

5          And the collateral consequences on your family and

6  on your children.  I am glad your older daughter is inspired

7  to be a lawyer.  I hope she becomes a great lawyer.  In a way,

8  she's made lemonade out of lemons.

9          The consequences to your man, I have to tell you,

10 that made my skin crawl.  Because I saw that man testify here,

11 and it is a tragedy what happened to that man.  A tragedy.

12 You all came from bad neighborhoods.  I knew what that is.  I

13 grew up in the South Bronx in the projects.  Nobody has to

14 tell me.  I know.  I know what it takes to pull yourself out

15 of there.  It is not easy.  But for a person that you

16 supposedly have a close familial bond, clearly a person who

17 has devoted himself to doing good, by the testimony that he

18 gave.  I will never forget his testimony about, you know,

19 working, I think he was working as a courier, and he was

20 walking around with his resume in his pocket just waiting for

21 the opportunity.  He makes a delivery to the US Attorney's

22 office in this district, and he says, there's an opportunity

23 here.  I am going to take my resume.  And the rest was

24 history, and he rose through the ranks.  And he was a beloved

25 employee.  Highly trusted.  He highly trusted you, his man.

1  The father of his goddaughter.  He talked about how you all

2  went to each other's weddings and took care of each other's

3  family and all of that.  And you preyed on that without ever

4  once thinking about what it meant to him, about the fact that

5  he would lose his pension that he worked so hard for.  A real

6  self-made person.  A real success story that we don't hear

7  enough of from our poor communities, you, yourself, destroyed,

8  destroyed, and for what?  You knew what you were asking him to

9  do was wrong.  He knew in his heart of hearts, but this was

10  family.  And you were counting on that.  And you played on

11  that.  And you dragged him down with you.

12          It is also disturbing to the Court, and I have

13  discussed it, I think enough, I don't need to go over it much

14  more, that despite all of this, despite knowing that you could

15  be facing a possibility of up to ten years for obstruction of

16  justice, I could impose the sentences to run consecutively,

17  that you would still, in violation of an order of the state

18  court, go out there and represent -- practice law and

19  represent somebody without having a license.

20          You sit here and tell me that you apologize, that

21  you feel remorse, that you -- that it is lack of judgment or

22  whatever, some prior lack of good judgment.  Well, when is it

23  going to end?  I mean, you did that within days of the order

24  coming down.

25          I understand that you have done some good things.

1　The letters attest to it.  I don't think that you would have

2　gotten re-elected so many times if your constituents didn't

3　think that you were doing good things for them.  I believe

4　they are sincere in what they say.  But I have to concur with

5　the government, that that's what you are supposed to do as an

6　elected official.  A person representing their neighborhood,

7　whether it is in the Assembly or in the state Senate or in

8　Congress, is supposed to look out for their people and address

9　their issues, and make sure that they are taken care of, and

10　make sure that in a time of natural disaster they have a dry

11　home to sleep in, that they have food, they have medical care.

12　That the schools are good for all the kids.  That there's

13　health care for everybody.  That there's diversity in the

14　judiciary and in other aspects of government.  That's what a

15　good public servant is supposed to do.  And maybe occasionally

16　you did go above and beyond that.

17　　　　　But I do not believe that those acts of public

18　service, those good acts of public service, warrant the kind

19　of variance downward that your attorneys are looking for

20　because it doesn't wipe out all these other aggravating

21　factors that I have just talked about.  There has to be a

22　sense that we give to the public that we are going to

23　safeguard the integrity of our system.  That we are going to

24　safeguard the constitutional principles that we hold dear.

25　That we will hold our public officials to a higher standard,

1   that we will hold our attorneys to a higher standard.

2           The Court sentences you as follows:  As to Count 4,

3   to 60 months, as an upward variance, of custody.

4           As to count -- that became Count 9, correct?  I am

5   having trouble.

6           MR. TUCHMANN:  There was a Count 4.  You are

7   referring to the obstruction count?

8           THE COURT:  No.  The first statement, false

9   statement count.  That become Count 9, under the superseder,

10  right?

11          MR. TUCHMANN:  In the --

12          THE COURT:  I am having trouble reading my

13  handwriting.

14          MR. TUCHMANN:  Sure.  Your Honor, in the sixth

15  superseding, in the superseding indictment, the one that was

16  put in front of the jury, which relates to the false

17  statements, the check register page --

18          THE COURT:  We are changing the -- it is Count 9.

19  It is Count 9.  We are changing it to reflect the fifth

20  superseder, correct?

21          And Count 11, as to each one of the false

22  statements, 60 months custody on each count, all sentences to

23  run concurrent with each other, each one followed by three

24  years of supervised release.  The terms of supervised release

25  to run concurrent with each other, as well.

1          A fine is imposed in the amount of $75,000, payable

2    in the amount of $25 per quarter while in custody, and 10

3    percent the gross income, monthly income, while on supervised

4    release.

5          One thing that bears mention.  For the life of me, I

6    cannot understand what kind of monetary incentive there was

7    for the embezzlement, in particular, given that your wife

8    earns almost three-quarters of a million dollars per year as a

9    partner at a highly prestigious international CPA firm.  You

10   did well yourself.  What level of greed do you have to have to

11   have to engage in this conduct?

12         Special conditions of supervised release include the

13   following:  No possession of a firearm, ammunition or

14   destructive device.  Compliance with the fine order.  Full

15   financial disclosure to probation.  If requested, you must

16   provide commingled income, expenses, assets and liabilities,

17   including yearly income tax returns, with the exception of the

18   financial accounts reported and noted within the pre-sentence

19   report.  You are prohibited from maintaining and/or opening

20   any additional individual and/or joint checking, savings, or

21   other financial accounts for either personal or business

22   purposes, without the knowledge and approval of the probation

23   department.

24         You shall cooperate with the probation officer in

25   the investigation of your financial dealings and provide

1  truthful monthly statements of your income and expenses.  You

2  must cooperate in the signing of any necessary authorization

3  to release information forms permitting the probation

4  department access to your financial information and records.

5       You must not encumber or liquidate any interest in

6  any assets unless it is direct service of the fine obligation

7  or otherwise has the express approval of the court.

8       You must maintain verifiable lawful employment.

9       There is a special assessment of $100 that is

10  imposed.

11       Restitution and forfeiture are not applicable here.

12       MR. TUCHMANN:  If I may, Your Honor, just for

13  special assessment, is it a $100 --

14       THE COURT:  I'm sorry.  It is $100 per count, for a

15  total of $300.  Thank you.

16       To be clear, the sentence is 60 months custody of

17  the Attorney General on each count, to run concurrent with

18  each other.

19       A request was made for recommendation to the Bureau

20  of Prisons that the defendant be housed in FCI Otisville,

21  correct?

22       MR. AKERMAN:  That's correct, Your Honor.

23       THE COURT:  There was a request about a minimum

24  security facility within that facility.  I cannot make that

25  kind of a recommendation.  The level of security housing is

1    purely up to the discretion of the Bureau of Prisons and is

2    not within the purview of the Court.  And, of course, I will

3    make, however, a recommendation that he be housed in FCI

4    Otisville, with the understanding, Mr. Sampson, that while the

5    Bureau of Prisons has assured the Court that it will do what

6    it can to comply with the recommendation made by the Court,

7    that, ultimately, where you are housed depends on the number

8    of factors and is ultimately within the discretion of the

9    Bureau of Prisons.  You understand that?

10           There was also a request that the defendant be

11   allowed to voluntarily surrender.  I know that the status

12   report from pretrial services said he is a viable candidate

13   for voluntary surrender.

14           Any objection by the government?

15           MR. TUCHMANN:  No, Your Honor.

16           MR. AKERMAN:  Your Honor, one additional request.

17           THE COURT:  Yes.

18           MR. AKERMAN:  We would also ask that Mr. Sampson

19   remain free pending appeal in this case.

20           THE COURT:  Well --

21           MR. AKERMAN:  Do you want me to talk further about

22   that?

23           THE COURT:  Yes.  I have not considered that, and I

24   don't know if the government wants to be heard.

25           MR. AKERMAN:  Maybe --

1    THE COURT:  I considered voluntary surrender, but

2    not bail pending appeal.

3    MR. AKERMAN:  I understand.

4    Basically, there's two factors to allowing a

5    defendant to be released pending appeal.  One, that there's

6    clear and convincing evidence that the person is not likely to

7    flee or pose a danger to the safety of any other person in the

8    community.  And I think clearly that's a situation,

9    Mr. Sampson has been punctual at court, he has been here all

10   the time.  I think Your Honor found that after the jury came

11   in, it's continued to be true.

12   And the second factor is that the appeal raises a

13   substantial question of law or fact that would result in

14   reversal of a new trial or a sentence that does not include a

15   term of imprisonment.  In this case, Your Honor, there is

16   never -- the Second Circuit has never addressed the issues

17   that we raised on the witness tampering versus the 1512 versus

18   the 1503.  Those are all issues that will be a first

19   impression in the Second Circuit.

20   There's also the issue on the false statement

21   claims -- charges, respecting the actually putting into

22   evidence the underlying contemporaneous statement, the notes.

23   I don't believe any court has ever addressed that particular

24   issue.

25   So there are definitely issues that raise

1  substantial issues of law or fact that would be significant

2  here.  And for that reason, we would ask that Mr. Sampson be

3  permitted to be out pending appeal.

4              THE COURT:  Does the government wish to be heard?

5              MR. SOLOMON:  Yes, Your Honor.  We oppose that

6  application for several reasons.  First of all, the defendant

7  does maintain significant ties to the country of Guyana, and

8  given the sentence of 60 months that Your Honor has imposed

9  here, that provides extra incentive for him to flee.

10             Additionally, the defendant did not raise or mount

11 Rule 29 arguments as to all counts of conviction.  As

12 Your Honor no doubt is aware, you applied a sentence of 60

13 months as to all counts of conviction.  Therefore, even were

14 the defendant to prevail on his rather novel theory as to

15 obstruction of justice, it would be harmless error as the

16 conviction of 60 months would still stand.

17             MR. AKERMAN:  If I might just respond briefly,

18 Your Honor.

19             THE COURT:  Yes.

20             MR. AKERMAN:  We did not raise the Rule 29 as to the

21 count in the liquor store, however, we are going to raise on

22 appeal the fact that the Court did not permit into evidence

23 the underlying statement that was taken, the contemporaneous

24 notes that were done by the FBI agents, which we think are

25 critical to really explaining Mr. Sampson's state of mind and

1  whether or not he lied.  Your Honor didn't allow that into

2  evidence.  This is an issue that has never been brought before

3  any appeals court that we're aware of, and does raise a

4  substantial question of law or fact that we would be bringing

5  to the Second Circuit.  It wasn't appropriate to bring on a

6  Rule 29 motion, since it did not go to the weight of the

7  evidence -- didn't go to the -- an issue that was appropriate

8  for a Rule 29 issue.  It really is an evidentiary issue that

9  is appropriate for appeal and not Rule 29.

10           MR. SOLOMON:  Your Honor, just briefly.

11           THE COURT:  Any response?

12           MR. SOLOMON:  Yes.  It is our view that that

13  argument betrays a fundamental lack of understanding as to the

14  rules of evidence, that he would somehow admit agent notes

15  into evidence.  And we went over this at length at trial.  And

16  I think that's almost an entirely spurious argument.

17           MR. AKERMAN:  If I might just respond briefly.

18  Mr. Sampson has been charged with perjury in a grand jury.

19  Certainly, the grand jury minutes would have been admissible.

20  We would argue the same for the notes.  Since it really isn't

21  for -- it goes to what was said and the context in which it

22  was said.  And that is an issue that has never been brought

23  before the Court of Appeals before.

24           THE COURT:  The request for bail pending appeal is

25  denied.  Defendant does continue to have ties to Guyana.  The

1   sentence is certainly incentive to flee, especially in light

2   of the arguments that were made by defense here today.  I

3   don't hold the same view of the issues that you purport to

4   raise on appeal.  So the request for bail is denied.

5           Given how long it will take for a designation,

6   defendant is to voluntarily surrender at the designated

7   facility at 9:30 in the morning on April 21, which is a

8   Friday.

9           You are advised -- I think that as far as the

10  sentence is concerned, is there anything else other than I am

11  about to advise Mr. Sampson of his right to appeal?

12          MR. SOLOMON:  The only other issue, Your Honor, is

13  the outstanding counts of the underlying indictments.

14          THE COURT:  Yes.  Well, as to superseding indictment

15  5, he was acquitted of the counts that were submitted.  The

16  underlying indictments remain open.

17          MR. SOLOMON:  We move to dismiss them at this time,

18  with the exception of the two embezzlement counts, which

19  Your Honor has already dismissed, and they are now the subject

20  of appeal from the fifth superseding indictment.

21          THE COURT:  I except the embezzlement counts from

22  the fifth superseding indictment.

23          The interest is waived on the fine.

24          Mr. Sampson, you are advised that you have a right

25  to appeal from the sentence and judgment of the Court.  You

1   may be entitled to be represented by counsel on appeal.  If

2   you cannot afford counsel, you may ask for the court to

3   appoint counsel for you at no cost to you.  If you cannot

4   afford the fees and the cost of the appeal, you may ask for

5   leave from the court to appeal by way of poor person relief.

6           And, of course, Counsel, I would ask that you all

7   remain on the case for that requisite 14-day period.  If you

8   are going to appeal, you must do so within 14 days of the

9   final entry of judgment.  So I would ask that counsel stay on

10  the case for that requisite period and file such a notice on

11  behalf of Mr. Sampson, if that is his desire.

12          Anything else?

13          MR. SOLOMON:  Not from the government.  Thank you,

14  Your Honor.

15          THE COURT:  Counsel?

16          MR. AKERMAN:  Nothing else, Your Honor.  Thank you.

17          THE COURT:  Thank you.

18          (Proceedings concluded at 12:58 p.m.)

19                        * * * * *

20              **<u>REPORTER'S CERTIFICATE</u>**

21      I, ANNETTE M. MONTALVO, do hereby certify that the above
    and foregoing constitutes a true and accurate transcript of my
22  stenographic notes and is a full, true and complete transcript
    of the proceedings to the best of my ability.
23
        Dated this 13th day of February, 2017.
24
    /s/Annette M. Montalvo
25  Annette M. Montalvo, CSR, RDR, CRR
    Official Court Reporter